97 F.3d 347
 40 U.S.P.Q.2d 1225, 96 Cal. Daily Op. Serv. 7283,
96 Daily Journal D.A.R. 11,949
 Don McCLARAN, dba Class VI Whitewater, Plaintiff-Appellee,
v.
PLASTIC INDUSTRIES, INC., a Tennessee corporation, Defendant,
and
Rotocast Plastic Products, Inc., a Florida corporation;
Rotocast Plastic Products of Tennessee, Inc., a
Tennessee corporation, Defendants-Appellants.
Don McCLARAN, dba Class VI Whitewater, Plaintiff-Appellee,
v.
PLASTIC INDUSTRIES, INC., a Tennessee corporation, Defendant-Appellant,
and
Rotocast Plastic Products, Inc., a Florida corporation;
Rotocast Plastic Products of Tennessee, Inc., a
Tennessee corporation, Defendants.
Don McCLARAN, dba Class VI Whitewater, Plaintiff-Appellant,
v.
PLASTIC INDUSTRIES, INC., a Tennessee corporation; Rotocast
Plastic Products, Inc., a Florida corporation; Rotocast
Plastic Products of Tennessee, Inc., a Tennessee
corporation, Defendants-Appellees.
 Nos. 94-35168, 94-35170 and 94-35175.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 11, 1995.
Submission Vacated April 20, 1995.
Resubmitted June 19, 1995.
Decided Sept. 30, 1996.
 
 John A. Lucas, Hunton & Williams, Knoxville, TN, for defendants-appellants-cross-appellees Rotocast Plastic Products of Tennessee, Inc., and Rotocast Plastic Products, Inc.
 Andrew W. Chasan, Bohner, Chasan & Walton, Boise, ID, for defendant-appellant-cross-appellee Plastic Industries, Inc.
 William Breck Seiniger, Boise, ID, and Kenneth W. Eklund, Boise, ID, for plaintiff-appellee-cross-appellant.
 Appeals from the United States District Court for the District of Idaho, Marion J. Callister, Senior Judge, Presiding. D.C. No. CV-88-01197-MJC.
 Before: POOLE, BOOCHEVER, and WIGGINS, Circuit Judges.
 OPINION
 WIGGINS, Circuit Judge:
 
 
 1
 Appellants/cross-appellees Plastic Industries, Inc., Rotocast Plastic Products of Tennessee, Inc., and Rotocast Plastic Products, Inc. appeal (1) the district court's order, filed November 16, 1993, which denied appellants' motions for judgment as a matter of law or, alternatively, for a new trial; (2) the Amended Judgment, filed December 1, 1993; and (3) the Second Amended Judgment, filed December 3, 1993. Appellee/cross-appellant Don McClaran cross appeals the district court's (1) remittitur on the jury award of damages; (2) finding that R/F is not liable for trademark infringement or for inducement to breach based on an alter ego theory; and (3) denial of attorney's fees. The district court had jurisdiction over this action pursuant to 28 U.S.C. § 1332 (1994). We have jurisdiction under 28 U.S.C. § 1291 (1994). We affirm in part, reverse in part, and remand for further proceedings.
 
 OVERVIEW
 
 2
 This action arises out of a contract dispute. In 1983, McClaran entered into a contract with PI, whereby McClaran helped Plastic Industries, Inc. (PI) create a mold to mass-produce the "P-51 Mustang" kayak, which McClaran designed, in exchange for royalty payments based on the number of kayaks sold by PI. The McClaran-PI contract was non-assignable and governed by Tennessee law. In 1984, PI sold its kayak-making "Hydra" division to Rotocast Plastic Products of Tennessee, Inc. (Rotocast/Tennessee or R/T), a wholly-owned subsidiary of Rotocast Plastic Products, Inc. (Rotocast/Florida or R/F) created for the purpose of acquiring the Hydra division. Among the assets delivered to R/T was the Mustang mold. After an unsuccessful effort to obtain McClaran's consent to the assignment of the McClaran-PI contract, R/T began to produce kayaks from the mold without paying royalties to McClaran. McClaran filed suit against PI, R/T, and R/F.
 
 
 3
 The jury considered three claims--breach of contract by PI, inducement to breach contract by R/T, and trademark infringement by R/T--and returned findings for McClaran on all questions submitted to it. Although McClaran pled inducement to breach and trademark infringement against both R/T and R/F, the trial court dismissed R/F at the close of McClaran's case because McClaran did not prove that R/F was the alter ego of R/T. The jury, therefore, did not consider R/F's liability. After trial, despite its earlier dismissal of R/F, the district court entered judgment against R/F, holding it directly liable for inducement of breach of contract. All defendants appeal, and McClaran cross appeals.
 
 BACKGROUND
 
 4
 McClaran, a professional kayaker, formed a partnership called "Class VI Whitewater" to design and build kayaks. In 1981, he designed a distinctive kayak called the P-51 Mustang, which became popular due to its maneuverability. The P-51 Mustang kayaks were built by hand out of fiberglass. On each kayak was a logo, referred to as an "M" logo by McClaran, which consisted of "three stylized lines, flowing like water around a boulder, with two of the lines sweeping upward and the third line sweeping down." The lines flowed around the company name, Class VI Whitewater. The logo was registered as a trademark in Utah.
 
 
 5
 In 1982, PI persuaded McClaran to allow it to mass-produce and market the Mustang in Rotocast plastic through a process called rotomolding, which would result in a lighter and less expensive boat. PI dealt with McClaran through Ken Horwitz, the marketing director of PI's Hydra division.
 
 
 6
 McClaran contends that PI made several promises regarding royalties and protections for McClaran's design during their extensive negotiations. According to McClaran, Horwitz gave him the impression that Hydra would be a permanent part of PI. Horwitz and McClaran also discussed plans for McClaran to create for PI two derivative designs, the Maverick and the Lightning. McClaran asserts that he relied on Horwitz's oral promises when he delivered to PI the plug, a prototype model around which a mold is constructed, for the Mustang on January 1, 1983. McClaran and PI signed a written agreement, dated June 9, 1983, drafted by PI. McClaran contends that he signed the contract because PI told him he would not be paid unless he did so. The contract contained an integration clause and a non-assignment clause. It did not discuss, however, the status of the Hydra division or future design contracts.
 
 
 7
 Producing Mustang parts through contractors in various parts of the country and assembling the Mustangs in Tennessee, PI experienced production and quality control problems and was unable to keep up with demand. In 1983, Horwitz warned PI that it would have to internalize the rotomolding process in order to meet sales expectations, maintain quality, and avoid losses. PI declined to do so. PI became unable to fill orders because it could not produce enough Mustangs.
 
 
 8
 In 1984, Robert Grossman, chairman of both Rotocasts, inquired about the purchase of PI's kayak business. In a written agreement, dated September 26, 1984, R/F agreed to purchase PI's Hydra division, but the agreement allowed R/F to back out if PI could not obtain assignments of PI's contracts with designers, specifically mentioning McClaran. Grossman told Horwitz that he had reviewed PI's contracts with boat designers and promised to honor them.
 
 
 9
 On October 2, 1984, PI sent McClaran a consent to assignment form. McClaran apparently did not return it. On November 7, 1984, PI completed the sale of its Hydra division to R/T, as contemplated in the PI-R/F Agreement.
 
 
 10
 Grossman had several phone conversations with McClaran. Thereafter, Grossman attempted to obtain McClaran's agreement to assignment of the McClaran-PI contract by sending McClaran a letter of agreement on January 7, 1985, and a Licensing Agreement on January 22, 1985. McClaran declined to sign the letter of agreement; however, he signed the Licensing Agreement, which provided that R/T would pay McClaran $3 per kayak instead of $15 per kayak in royalties.[1] At trial, McClaran testified that what he sent back was the contract with his own modifications written in pencil. He also testified that Grossman told him that if he did not sign the contract, R/T would rename the kayak and cease to pay any royalties. R/T did exactly that in February 1985. R/T changed the name of the boats to "Matador." The kayaks, however, continued to have molded on their hull the "M" logo, consisting of three wavy lines. These lines were in the mold delivered to R/T. McClaran sued the Rotocasts, claiming that the "M" logo on the Matador was infringing his trademark.
 
 
 11
 The jury found for McClaran on all claims against PI and R/T, and awarded the following damages. First, the jury awarded $164,775 in lost royalties as compensatory damages for PI's breach of contract. The parties agreed that this sum represents the royalties on the Mustang that PI would have paid McClaran under the contract, if PI had sold the number of boats projected in McClaran's exhibit. Second, the jury awarded $385,893 in compensatory damages for R/T's inducement to breach. The district court found that this number was borrowed from McClaran's exhibit projecting royalties for the Mustang and two other boats, the Maverick ($108,592.50) and the Lightning ($104,275), which McClaran would have designed for PI if PI had not been induced to breach its contract. Because the figure on McClaran's exhibit contained a mathematical error, the district court ordered a remittitur to the proper figure, $377,642. On the inducement claim, the jury also found R/T liable for punitive damages, which were stricken by the district court. Third, the jury awarded $843,750 in compensatory damages for R/T's infringement of McClaran's trademark.[2] The jury did not award any damages against R/F because the court had determined that R/F was not R/T's alter ego and dismissed R/F as a party at the close of presentation of McClaran's evidence.
 
 
 12
 Ruling on the parties' post-trial motions, the district court found that the award of lost royalties and lost rotomolding profits were inconsistent; therefore, it ordered a remittitur of the $377,642 and $843,750 awards against R/T to a total of $843,750, conditional on McClaran's consent. The court's order stated that the court would grant R/T's motion for a new trial if McClaran decline to accept the remittitur. McClaran accepted under protest, conditional on his being permitted to challenge the propriety of the remittitur if defendants appealed. In the same order, the court held that R/F was directly liable for inducement to breach even though it had previously dismissed R/F from the action. The district court entered judgment against PI for $164,775; R/T for $843,750; and R/F for $377,642.[3]
 
 STANDARD OF REVIEW
 
 13
 A denial of a motion for judgment as a matter of law is reviewed de novo. See Bank of the West v. Valley Nat'l Bank of Arizona, 41 F.3d 471, 477 (9th Cir.1994). The district court's decision concerning a motion for new trial is reviewed for an abuse of discretion. Browning-Ferris Indus. of Vermont, Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 278, 109 S.Ct. 2909, 2921, 106 L.Ed.2d 219 (1989).
 
 
 14
 We review for abuse of discretion a district court's formulation of civil jury instructions. Fikes v. Cleghorn, 47 F.3d 1011, 1013 (9th Cir.1995). A district court abuses its discretion if it does not apply the correct law or if it rests its decision on a clearly erroneous finding of a material fact. Kayes v. Pacific Lumber Co., 51 F.3d 1449, 1464 (9th Cir.), cert. denied, --- U.S. ----, 116 S.Ct. 301, 133 L.Ed.2d 206 (1995).
 
 DISCUSSION
 
 15
 I. Claim Against Plastic Industries, Inc.
 
 
 16
 Breach of contract was the only claim against PI that went to the jury. The jury found that PI had breached its contract with McClaran and awarded compensatory damages in the amount of $164,775. PI challenges the finding of breach by arguing that McClaran waived or consented to any breach. PI argues that: (1) the district court should have granted summary judgment or judgment as a matter of law on the issue of breach because the finding of breach was not supported by evidence or the finding was contrary to the great weight of the evidence at trial and (2) a new trial should be granted because the district court failed to instruct the jury on PI's affirmative defenses to breach. We affirm the jury's finding of breach. We also conclude that the district court did not abuse its discretion in refusing to instruct the jury about PI's affirmative defenses.
 
 
 17
 In addition, PI challenges the amount of damages awarded on the following grounds: (1) that McClaran's proof of damages was insufficient or too speculative to support any damage award as a matter of law and (2) that the damages were clearly excessive and based upon improper evidence and the opinion of an unqualified expert. We remand for a new trial on damages because McClaran's proof of damages was speculative.
 
 A. Breach of Contract
 
 18
 1. The Jury's Finding of Breach Was Supported by the Evidence
 
 
 19
 The First Amended Complaint alleges that PI's assignment of the contract to R/T without McClaran's consent and transfer of the mold for producing Mustang kayaks to R/T constitute a breach of contract. McClaran contends that this action by PI violated their contract's non-assignment clause, the covenant to guard against theft of design, and the covenant to pay royalties.
 
 
 20
 It is undisputed that the contract contained a clause prohibiting assignment, and that PI assigned the contract before, or without, obtaining McClaran's consent. The contract also contained a clause obligating PI to guard against "theft of design." The jury heard testimony about whether this ambiguous term was intended to protect the plug/model only, or the mold as well. We conclude that the jury could rationally have found that by turning the mold over to R/T without McClaran's consent, PI breached the covenant to guard against theft of design. Accordingly, the jury's finding of breach is sufficiently supported by evidence.
 
 
 21
 2. The District Court Did Not Err in Refusing to Instruct
 
 
 22
 the Jury on PI's Affirmative Defenses
 
 
 23
 PI contends that the district court erroneously refused to instruct the jury on PI's affirmative defenses to breach. It had requested that the court instruct the jury as to (1) waiver; (2) consent to assignment; (3) release; (4) repudiation and discharge; (5) novation; and (6) estoppel. Although the court rejected PI's proposed instructions, it used McClaran's instruction on waiver, defining waiver simply as the "intentional relinquishment of a known right," which did not significantly differ from PI's proposed instruction. PI argues only that the court's refusal to give the consent to assignment[4] and repudiation/discharge[5] instructions was error; therefore, we will consider only those two instructions on appeal. See International Union of Bricklayers & Allied Craftsman Local Union No. 20 v. Martin Jaska, Inc., 752 F.2d 1401, 1404 (9th Cir.1985) ("[W]e will not ordinarily consider matters on appeal that are not specifically and distinctly raised and argued in appellant's opening brief.").
 
 
 24
 According to PI, the evidence established that McClaran waived his rights against PI by not objecting to the assignment to R/T and by not notifying PI that he intended to continue to hold PI responsible for R/T's performance. See Restatement (Second) of Contracts § 329 (repudiation and novation). Section 329 states:
 
 
 25
 If the obligor, with knowledge of such a repudiation, accepts any performance from the assignee without reserving his rights against the assignor, a novation arises by which the duty of the assignor is discharged and a similar duty of the assignee is substituted.
 
 
 26
 Pursuant to § 329, the affirmative duty to manifest an intent to continue to hold PI liable only arose if McClaran accepted performance by R/T. The issue here is whether the district court was justified in finding there was not sufficient evidence of McClaran's acceptance of R/T's performance to instruct the jury as to PI's consent to assignment and repudiation/discharge affirmative defenses.
 
 
 27
 The district court found that McClaran had negotiated with R/T without ever accepting performance by R/T. PI, however, points to the fact that McClaran signed R/T's proposed Licensing Agreement, which provided that R/T would pay McClaran $3 per boat in royalties. He signed, apparently, because R/T offered him $3 per boat or nothing. Significantly, the cover letter attached to the Licensing Agreement stated that R/T was giving McClaran "a final chance" to call R/T "and discuss this matter before Feb. 1. After that it will be too late for [R/T] to change [its] plans." Letter to McClaran from R/T Chairman Grossman, dated Jan. 22, 1985. McClaran signed the Licensing Agreement on February 15, 1985.
 
 
 28
 The fact that McClaran signed and returned the Licensing Agreement after the February 1st deadline set by R/T supports the district court's finding that McClaran did not intend to accept R/T's performance; instead, he was "negotiating with [R/T] on a couple of items on that contract [that he] wanted to get changed." Tr. (Day 3) at 26:3-4. Neither McClaran nor R/T treated the Licensing Agreement as an enforceable contract; for example, R/T never paid McClaran any royalties. Furthermore, based on the language of Grossman's letter, R/T's offer expired as of February 1. Hence, unless R/T agreed to an extension of time, even had McClaran intended to accept the offer, there was no longer an offer to accept. The record does not indicate that R/T agreed to an extension of time. In sum, McClaran and R/T did not enter into a new agreement.
 
 
 29
 Accordingly, we find that there was insufficient evidence of acceptance by McClaran to instruct the jury on the defense of consent to assignment or repudiation and discharge. The trial court's finding that McClaran did not accept R/T's performance was not clearly erroneous, and its refusal to instruct the jury on the affirmative defenses at issue on appeal was not an abuse of discretion.
 
 B. Damages
 
 30
 First, PI contends that, as a matter of law, damages for lost royalties were too speculative to be awarded. That is, McClaran did not and could not prove damages for lost royalties with reasonable certainty. Second, PI argues that McClaran's proof of damages was based on false factual assumptions because evidence favoring the plaintiff was improperly admitted.
 
 
 31
 1. The Amount Awarded in Damages for Lost Royalties Was Speculative
 
 
 32
 a. Measure of Damages Under Tennessee Law
 
 
 33
 When exercising diversity jurisdiction over a claim for breach of a contract governed by Tennessee law, the district court applies Tennessee's law regarding proof of damages. See Grantham & Mann, Inc. v. American Safety Prods., Inc., 831 F.2d 596, 601 (6th Cir.1987); see also Erie R.R. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).
 
 
 34
 McClaran had the burden of proving damages at trial. Grantham & Mann, 831 F.2d at 601. The general rule in Tennessee is that "damages are not permitted which are remote and speculative in nature." Id. The rule precluding speculative damages "serves to preclude recovery, however, only where the fact of damage is uncertain.... Once the existence of damages has been shown, all that an award of damages requires is substantial evidence in the record to permit a factfinder to draw reasonable inferences and make a fair and reasonable assessment of the amount of damages." Id. at 602.
 
 
 35
 A jury's award of damages may be stricken where an assumption necessary to support that award is wholly speculative. See id. "[E]ven if the existence of lost profits is established, recovery is properly denied if the plaintiff fails to provide 'a sufficient basis for the jury's computation of the damage,' by 'furnishing data from which the amount of the probable loss could be ascertained as a matter of reasonable inference,' and 'determined with reasonable certainty.' " Id. (citations omitted). An award of lost profits for an existing business is not speculative if the business's track record supplies a basis for the award. See id.
 
 
 36
 For the reasons stated below, we conclude that the Mustang has a track record that could provide the basis for an award of lost royalties.[6] The jury's award is, however, insufficiently grounded in that track record.
 
 
 37
 b. Analysis
 
 
 38
 Assuming McClaran was injured by the assignment, PI points out that McClaran's projections for future sales were wildly out of proportion to actual past sales. Only 656 kayaks made from the mold had ever been sold: PI sold 339 in 1984, and R/T sold 317 after it received the mold. At trial, McClaran testified as an expert on the kayak market and projected that, if PI had not breached the contract, PI would have sold 10,200 kayaks during 1985-1999. The jury adopted this projection by awarding royalties based on 10,200 kayaks, as compensatory damages for PI's breach.[7]
 
 
 39
 McClaran's projections were based on market projections that Horwitz, PI/Hydra's marketing director, had compiled in 1984. PI contends that these projections were based on a number of speculative, unsupportable assumptions. First, McClaran assumed that the Mustang kayak would capture a large portion of the market for recreational whitewater kayaks (21.4% the year after the breach, up from approximately 5% when it was being produced by PI). Second, McClaran assumed that the Mustang kayak would continue to sell well, although in declining numbers, for 15 years. Third, he assumed that PI would have been able to produce enough kayaks to meet the demand, despite PI's history of production problems, which had prevented PI from ever filling all the orders for the kayaks.
 
 
 40
 To justify ignoring the discrepancy between demand and actual sales, McClaran argued that PI should have solved its production difficulties by bringing the rotomolding in-house. If PI had done so, it would have been able to correct its quality control problems, and PI would have been able to meet demand for the kayaks. However, although it might have made business sense to rearrange production, the McClaran-PI contract did not require PI to do so. PI had rejected Horwitz's suggestion to do so, and damages based on what PI could have sold if it had somehow solved its production problems far exceeded what McClaran realistically would have received under the contract.
 
 
 41
 Therefore, we find that the jury improperly awarded projected royalties based on what PI could have sold, had it solved its production difficulties, rather than on what it would have sold, given its track record and its decision not to bring the rotomolding in-house. The assumption that the production difficulties could have been solved was an insufficient basis for the jury's computation of damages. Without a solution to these production difficulties, it was also speculative to assume that the Mustang kayak would have burst into the market and achieved a 21.4% market share in its third year of production.
 
 
 42
 Accordingly, the damages award cannot stand. However, McClaran did prove that he suffered some damage from the breach. For instance, he did not receive any royalty payments even though R/T produced kayaks from the Mustang mold. Even if no actual damages could be proven with certainty, McClaran would be entitled to nominal damages for the breach of contract. See Morristown Lincoln-Mercury, Inc. v. Roy N. Lotspeich Publishing Co., 42 Tenn.App. 92, 298 S.W.2d 788, 794 (1956).
 
 
 43
 Notwithstanding the reversal of the damages award, we further hold that the district court did not abuse its discretion in allowing McClaran to testify as an expert[8] and did not err in allowing McClaran to testify about Horwitz's alleged oral representations made to him before the integrated written contract was signed.[9]
 
 II. Claims Against Rotocast/Florida
 
 44
 A. Dismissal of Rotocast/Florida Based on Alter Ego Theory
 
 
 45
 McClaran appeals the district court's determination that R/F was not the alter ego of R/T. At the close of McClaran's case, the court dismissed R/F, ruling that McClaran had failed to show that R/F was an alter ego of R/T. See Continental Bankers Life Ins. Co. v. Bank of Alamo, 578 S.W.2d 625, 632 (Tenn.1979) (" 'In order to hold one corporation liable for the debts of another it must appear that they are business conduits or the alter ego of one another.' ") (citation omitted). A district court's application of the alter ego doctrine is reviewed for clear error. Towe Antique Ford Found. v. IRS, 999 F.2d 1387, 1391 (9th Cir.1993).
 
 
 46
 The standard for piercing the corporate veil in Tennessee has been described in various ways. The Tennessee Supreme Court summarized the general rule as follows:
 
 
 47
 [T]o disregard the corporate entities requires, in the case of parent and subsidiary, more than a showing that they have similar corporate names and locations and the exercise of dominion through common officers and directors. The case law covers a broad spectrum of disagreement as to the additional elements of proof required to disregard corporate entities.
 
 
 48
 Continental Bankers Life Ins. Co., 578 S.W.2d at 631 (citation omitted).
 
 
 49
 Piercing the corporate veil is an equitable remedy that is resorted to where respecting the corporate form would work injustice. See Electric Power Bd. of Chattanooga v. St. Joseph Valley Structural Steel Corp., 691 S.W.2d 522, 526 (Tenn.1985). McClaran contends that the following facts prove that R/F should be liable as R/T's alter ego. First, R/F created R/T to receive PI's Hydra division. However, at the time R/T was created, R/F could not have known that McClaran would not consent to assignment of the contract, so there is no reason to believe R/F created R/T to shield R/F from tort liability it knew was being incurred.
 
 
 50
 Second, McClaran points to the degree of control exercised by R/F over R/T. McClaran claims that R/F, through common officers and directors, caused R/T to produce Mustang kayaks that infringed McClaran's trademark. However, the same degree of control is present in most parent-subsidiary relationships. Some abuse of the corporate form--beyond mere control through common officers and directors--is required. Id.
 
 
 51
 Third, McClaran claims that some of R/F's practices blur the line between R/F and R/T when they interfaced with the public. For example, R/F letterhead was occasionally used for R/T business, Grossman signed some papers as chairman of R/F rather than R/T, and some Hydra designers contracted with R/F rather than R/T.
 
 
 52
 Fourth, R/F operates R/T at a loss. However, there is no indication that R/T was undercapitalized at the outset. Although R/F did guarantee a certain amount of R/T's debt, there is no indication that the financial accounting of the two companies were commingled or manipulated.
 
 
 53
 None of these alleged facts demonstrates that R/F and R/T abused the corporate form. Therefore, the facts relied upon by McClaran are not a sufficient basis to conclude that R/F and R/T are alter egos of each other or to conclude that honoring the corporate form would work injustice. We affirm the district court's finding that McClaran had not proved an alter ego theory.
 
 
 54
 B. Entry of Judgment Based on Direct Liability Theory
 
 
 55
 R/F appeals the district court's entry of judgment against R/F for direct liability on McClaran's inducement to breach claim. We conclude that due process bars the entry of judgment against R/F. R/F was dismissed before it had the opportunity to put forth evidence in its defense to direct liability for inducing PI to breach its contract with McClaran. Parklane Hosiery v. Shore, 439 U.S. 322, 327 n. 7, 99 S.Ct. 645, 649 n. 7, 58 L.Ed.2d 552 (1979) ("It is a violation of due process for a judgment to be binding on a litigant who was not a party or a privy and therefore never had an opportunity to be heard.").
 
 
 56
 As discussed above, McClaran originally sought to hold R/F liable by piercing R/T's corporate veil. At the close of presentation of McClaran's evidence, the court found that McClaran had failed to prove by the requisite clear and convincing evidence that R/F was R/T's alter ego. All claims against R/F were dismissed at that point. The jury was unambiguously instructed that R/F had been dismissed from the case.[10]
 
 
 57
 After trial, McClaran moved the court to enter judgment against R/F on the theory that R/F was directly liable for inducing PI to breach the contract and for trademark infringement. The district court agreed with respect to inducement of breach but not trademark infringement. The court ruled that R/F was directly liable "as a matter of law on the basis of the same evidence that was introduced as against Rotocast of Tennessee." Judgment was entered against R/F in the amount of $377,642. R/F unsuccessfully petitioned the court under Fed.R.Civ.P. 60 to set aside the judgment.
 
 
 58
 McClaran denies that R/F was dismissed from the case at the close of his evidence. McClaran asserts that, after the alter ego theory of liability was dismissed, R/F was still in the case, presumably on a theory of direct liability. McClaran's contention is incorrect. Prior to R/F's dismissal, all parties and the court implicitly assumed that R/F could be held liable only as R/T's alter ego. Direct liability was never mentioned or argued to the court. The First Amended Complaint alleges claims against "the Rotocasts" collectively, but no causes of action against R/F were submitted to the jury. It is clear that when the district court dismissed the alter ego theory of liability, the court acted as if it had dismissed R/F entirely from the action.[11] Therefore, although McClaran could have sought to keep R/F in the case under a theory of direct liability, he did not do so. The direct liability theory was not presented to the court before R/F's dismissal, and R/F was unequivocally dismissed.[12]
 
 
 59
 In light of R/F's dismissal, the entry of judgment against R/F violated due process: R/F had been dismissed before it had the opportunity to present evidence in its defense. Because R/F was no longer in the case, no findings of fact based on evidence presented at trial may be used against R/F. For the foregoing reasons, we reverse the judgment against R/F. We do not remand for a new trial on R/F's direct liability: the theory of direct liability was not argued before R/F's dismissal and was therefore waived or precluded.[13]
 
 III. Claims Against Rotocast/Tennessee
 
 60
 A. Do Improper Tactics and Argument by McClaran's Counsel Require a New Trial?
 
 
 61
 As stated above, the district court's denial of a motion for a new trial for prejudicial misconduct of counsel is reviewed for abuse of discretion. Furthermore, we have noted:
 
 
 62
 [I]mproprieties in counsel's arguments to the jury do not constitute reversible error unless they prejudice the defendant and that prejudice has not been remedied by the trial judge. In addition, the propriety of the ... remarks must be judged in relation to what would constitute a fair response to the remarks of defense counsel.
 
 
 63
 United States v. Lopez-Alvarez, 970 F.2d 583, 597 (9th Cir.), cert. denied, 506 U.S. 989, 113 S.Ct. 504, 121 L.Ed.2d 440 (1992).
 
 
 64
 The district court summarily found R/T's misconduct argument meritless. Specifically, R/T alleges that a new trial is required because of the following prejudicial misconduct by McClaran's counsel: (1) repeated references to R/T's wealth and power, specifically with respect to R/T's ability to hire "oceans of lawyers," and implication that R/T had millions of dollars but did not pay any taxes; (2) blatant appeal to the jury's sympathy and passion by referring to McClaran's hard-working nature and difficult financial circumstances; (3) appeal to regional bias; (4) attempt to coach witnesses with baseless objections; and (5) repeated questions on inflammatory subjects previously proscribed by the court, such as the Rotocasts' history of bad faith in dealing with other kayak designers.
 
 
 65
 McClaran argues that defense counsel made many of these subjects (the defendants' wealth, McClaran's lifestyle, and R/T's dealings with other designers) relevant to the case. McClaran's arguments are not entirely persuasive. Nonetheless, R/T's counsel failed on most occasions to ask for testimony to be stricken or for curative instructions from the judge, even though he objected to many of the improprieties. For that reason, and because we conclude that the improprieties did not reach a level that prejudiced the defendants, we do not believe the district court abused its discretion in failing to order a new trial on the basis of misconduct.
 
 B. Trademark Infringement
 
 66
 R/T appeals the district court's denial of its motion for judgment as a matter of law or, alternatively, for a new trial with respect to McClaran's trademark infringement claim.[14] The district court ruled that R/T had waived any challenge to the trademark claim by failing to renew its motion for judgment as a matter of law with respect to this claim at the close of all the evidence; therefore, R/T had waived its right to object to the jury's finding of infringement or to the amount of lost profits.
 
 1. Waiver
 
 67
 We hold that R/T's trademark issues were not waived because R/T objected to the court's jury instructions on the basis of insufficient evidence. Where a motion for judgment as a matter of law is made at the close of the plaintiff's case, "an objection to a jury instruction on the ground that insufficient evidence was presented on an issue to allow it to be submitted to the jury ... may constitute a 'sufficient approximation' of a motion for a directed verdict to satisfy the requirements of Rule 50(b)." Farley Transp. Co. v. Santa Fe Trail Transp. Co., 786 F.2d 1342, 1346-47 (9th Cir.1985) (quoting Villanueva v. McInnis, 723 F.2d 414, 418 (5th Cir.1984)).
 
 
 68
 Here, R/T objected to the trial court's jury instruction number 26 on the ground that there was "no evidence from which the jurors could determine with reasonable certainty any damages that were caused by the defendant's use of the three-wavy-line logo." Tr. (Day 10) at 37. This objection sufficiently preserved the issue for the later post-trial motion for judgment under Farley Transp. Co. Because the district court erroneously believed R/T had waived any challenge to the propriety of the finding of infringement and the amount of damages, it did not rule on the propriety of those findings. Accordingly, we reverse the district court's denial of R/T's motion for judgment as a matter of law or, alternatively, for a new trial, with respect to the trademark infringement claim against R/T and remand for further proceedings.
 
 2. Damages for Trademark Infringement
 
 69
 Although the trademark infringement claim is remanded for the district court's review of the jury's finding of liability, we further reverse the jury's award of damages in the event that the court upholds the finding of liability. We find that McClaran failed to prove with reasonable certainty that he suffered any damage as a result of the infringement.
 
 
 70
 The jury's award of $843,750 in compensatory damages for trademark infringement was based on speculation. All parties agreed that the award was intended to compensate McClaran for "lost rotomolding profits," i.e., the profits McClaran would have made if he had entered the rotomolding business after PI breached the contract. McClaran insists he would have done so had he not been deterred by R/T's infringement, its possession of the mold, and its threat of suit. However, neither the existence nor the amount of lost rotomolding profits can be shown with reasonable certainty.
 
 
 71
 a. Standard of Proof for Damages
 
 
 72
 The reviewing court should uphold the jury's award of damages unless it is based on speculation or guesswork. See City of Vernon v. Southern California Edison Co., 955 F.2d 1361, 1371 (9th Cir.), cert. denied, 506 U.S. 908, 113 S.Ct. 305, 121 L.Ed.2d 228 (1992). A speculative award cannot be upheld:
 
 
 73
 Trademark remedies are guided by tort law principles. As a general rule, damages which result from a tort must be established with reasonable certainty.... [A] reasonable basis for computation must exist. Many courts have denied a monetary award in infringement cases when damages are remote and speculative.
 
 
 74
 Lindy Pen Co. v. Bic Pen Corp., 982 F.2d 1400, 1407-08 (9th Cir.), cert. denied, 510 U.S. 815, 114 S.Ct. 64, 126 L.Ed.2d 34 (1993). Other courts have held that once the existence of some damages has been proven, the plaintiff should not be denied recovery due to uncertainty as to the amount. See, e.g., Grantham & Mann, 831 F.2d at 602.
 
 
 75
 b. Analysis
 
 
 76
 McClaran did not show with reasonable certainty that he suffered any damages from R/T's infringement. He was not making any kayaks at the time R/T began to produce the infringing Matadors. He was not actually selling any products whose marketability was impaired by R/T's infringement. He stopped making fiberglass kayaks when he signed the contract with PI. Although McClaran had once contemplated entering the rotomolding business, the contract with PI prohibited him from doing so for the duration of the contract. Once PI breached the contract, McClaran was free to enter the rotomolding business, but he had not yet done so.
 
 
 77
 McClaran's theory of damages is that he planned to enter the rotomolding business once he was freed from the contractual prohibition. He was deterred from doing so by R/T's infringement: he did not want to compete against R/T in light of R/T's threat to sue him for infringement. McClaran allegedly cannot enter that business now because he allowed a unique window of opportunity to pass at the time of PI's breach. Consequently, the infringement deprived McClaran of not only the sales he would have made to date, but also the entire value of the business he never started.
 
 
 78
 The jury's award of lost profits from trademark infringement is based on speculation. First, it requires the jury to believe McClaran's testimony that he wanted to enter the rotomolding business after PI breached. Second, the jury must believe that the only reason McClaran did not enter the rotomolding business is because R/T was marking boats with McClaran's wavy-line trademark. In other words, the jury must find that McClaran could have competed with R/T's Matador kayaks if they had been properly marked, but that he reasonably believed it would have been hopeless to compete with Matadors marked with wavy lines. Third, the jury must believe that McClaran's business venture would have made a profit, but that profits would have been diminished or eliminated by the customer confusion caused by the wavy lines on R/T's kayaks. Fourth, the jury must believe that the profit he would have made, competing against properly marked R/T kayaks, amounted to $843,750.
 
 
 79
 Assumptions one through three relate to the existence of damages, while assumption four relates to the amount of damages. Even assuming that McClaran would have entered the rotomolding business after PI's breach but for R/T's production of the Matador, the speculation involved in assumption four becomes even more apparent in light of the fact that nobody had ever made a profit from the Mustang or Matador. McClaran's tax returns show that he lost $8,489 making boats by hand (although he now argues that that was a tax, not a real, loss). PI lost over $400,000 in the two years it was rotomolding Mustangs (although McClaran claims that was due to PI's failure to bring the rotomolding in-house). R/T lost $27,720 on the Matador (although McClaran claims that was caused in part by the boycott he promoted). Therefore, there is no record of profits on which to base the assumption of profitability.
 
 
 80
 For these reasons, we reverse the jury's damages award for McClaran's trademark infringement claim.
 
 C. Inducement to Breach Contract
 
 81
 R/T also appeals the denial of its motion for judgment as a matter of law on the ground that there was insufficient evidence to hold it liable for inducement to breach contract under Tennessee common law.[15] McClaran, on the other hand, appeals the district court's grant of summary judgment on his statutory cause of action for inducement of breach.[16]
 
 
 82
 Tennessee recognizes both a statutory and common law cause of action for inducement to breach contract. See Quality Auto Parts Co. v. Bluff City Buick Co., 876 S.W.2d 818, 822 (Tenn.1994); Polk & Sullivan, Inc. v. United Cities Gas Co., 783 S.W.2d 538, 543 (Tenn.1989). Although both claims require the same elements,[17] they differ with respect to burdens of proof and remedies. See Edwards v. Travelers Ins. of Hartford, 563 F.2d 105, 119-20 (6th Cir.1977) (citations omitted). The statute requires a "clear showing" to establish a prima facie case, while at common law only a preponderance of the evidence is necessary. Id. at 120 (citing Emmco Ins. Co. v. Beacon Mutual Indem. Co., 204 Tenn. 540, 322 S.W.2d 226, 231 (1959)). In addition, under the statute, treble damages are mandatory and are in lieu of punitive damages. At common law, punitive damages are sometimes available. See id. at 120.
 
 
 83
 McClaran pled both the statutory and common law causes of action. On summary judgment, the trial court dismissed both claims, but it later reinstated the common law claim.[18] On appeal, McClaran contends that the statutory cause of action should not have been dismissed. R/T contends that there is insufficient evidence to support even the common law claim because no reasonable jury could have found the requisite malice. See TSC Indus., 743 S.W.2d at 173 (stating that claim of inducement of breach requires that the defendant acted with malice).
 
 
 84
 1. Common Law Claim for Inducement to Breach
 
 
 85
 What constitutes "malice" is dispositive of R/T's insufficient evidence contention. There is a split in Tennessee authority as to what constitutes "malice" for purposes of the tort of inducing breach.
 
 
 86
 In Testerman v. Tragesser, the Tennessee Court of Appeals for the Western Section held that "[m]alice or ill will must be established in order to recover for tortious interference with another's business." 789 S.W.2d 553, 556 (Tenn.Ct.App.1989). See also Hodges v. S.C. Toof & Co., 833 S.W.2d 896 (Tenn.1992) (defining malice as ill will, hatred, or personal spite for purposes of awarding punitive damages); Crain v. Kesterson Food Co., Inc., 1994 WL 52645 * 5 (Tenn.App. Feb. 16, 1994) (defining malice as "ill will, hatred, or personal spite").
 
 
 87
 The Court of Appeals for the Eastern Section has taken a different view. In Riggs v. Royal Beauty Supply, Inc., that court wrote:
 
 
 88
 [T]o have an inducement of breach of contract action, it must be established that the defendant acted maliciously. And malice, in this sense, is not factual malice, that is, hatred or spite or ill will. It's legal malice, and legal malice simply means a wilful violation of a known right, and as some of the cases have very actively said in a legal sense, malice is nothing more than the absence of justification. So if the plaintiff has to prove malice, then the plaintiff has to prove lack of justification.... [B]ut it is clear, under the law, that this is an intentional tort and the plaintiff must prove, must offer some evidence from which the jury could find that the defendant intended to procure a breach of contract and that the defendant took some action which brought about the breach of the contract.
 
 
 89
 879 S.W.2d 848, 851 (Tenn.Ct.App.1994) (quoting trial court judge). Neither the trial judge nor appellate court cited to any legal authority for this definition of malice.
 
 
 90
 In the instant case, the district court followed the approach taken by the Eastern Section, interpreting malice as synonymous with "intent to cause the breach."[19] The problem with that interpretation is that it makes the malice requirement duplicative of intent, despite the Eastern Section's agreement that malice and intent are two separate elements of the cause of action. See id. (citing TSC Indus., 743 S.W.2d at 173). For this reason, we follow the approach of the Western Section and conclude that, under Tennessee law, malice requires a showing of ill will, hatred or spite.
 
 
 91
 In light of this standard, the evidence establishes that (1) R/T knew about the contract between McClaran and PI; (2) R/T may have known that PI's delivery of the mold to R/T would be a breach of that contract; and (3) R/T nevertheless paid PI to deliver the mold. R/T pursued its own business interests aggressively and with indifference to the effect on McClaran. There is, however, no evidence of ill will or spite towards McClaran. Therefore, the judgment against R/T for inducement of breach of contract is reversed.
 
 2. Statutory Claim for Inducement to Breach
 
 92
 McClaran argues on cross appeal that his claim for inducement to breach under Tenn.Code Ann. § 47-50-109 was wrongly dismissed on summary judgment. He argues that only the fact of inducement needs to be shown by clear and convincing evidence and that the other elements require a showing of preponderance of evidence. This argument is incorrect. See Emmco Ins. Co., 322 S.W.2d at 231.
 
 
 93
 Accordingly and for the reasons stated above with respect to the common law inducement claim, we affirm the district court's finding that McClaran could not prove the elements of his statutory claim with the clear showing required. See Polk & Sullivan, 783 S.W.2d at 542.
 
 IV. McClaran's Cross Appeal
 
 94
 A. Should the Verdict be Reinstated Because it was not Inconsistent?
 
 
 95
 McClaran contends that the district court failed to make adequate attempts to reconcile the jury's verdict before it conditioned denial of a new trial on remittitur. McClaran proposes a reconciling theory: that all amounts awarded by the jury were for McClaran's lost rotomolding profits, and the jury merely apportioned its total estimate of McClaran's lost profits ($1,394,418) between the claims for breach of contract, trademark infringement, and inducement to breach.
 
 
 96
 This theory does not reconcile the verdict. Lost rotomolding profits could only be awarded for breach of contract if the jury intended to award McClaran his reliance damages, i.e., what he would have made if he had gone into business himself rather than signing the contract. Having awarded McClaran his foregone profits as reliance damages for breach, the jury could not find that McClaran suffered any additional damage from trademark infringement.
 
 
 97
 An award of damages for both breach and infringement can only be reconciled by assuming that the $164,775 was reliance damages for lost profits during the life of the contract, and the award for infringement was meant to cover lost profits after the breach. However, there is no basis in the evidence for the jury to find McClaran would have made $164,775 from the rotomolding business during the life of the PI contract.
 
 
 98
 B. Should the District Court Have Held R/F Directly Liable for Trademark Infringement?
 
 
 99
 On McClaran's post-trial demand for judgment pursuant to Fed.R.Civ.P. 54(c), the district court found R/F directly liable for inducement of breach, but not trademark infringement. McClaran claims this was error. As discussed above, any entry of judgment against R/F after trial warrants reversal as a violation of due process.
 
 
 100
 C. Should McClaran Have Been Granted Attorney's Fees?
 
 
 101
 McClaran contends that the district court erred by not granting his request for attorney's fees. It is within the court's discretion to award attorney's fees for actions to enforce unregistered, as well as registered, trademarks, but only for "exceptional" cases. See Transgo, Inc. v. Ajac Transmission Parts Corp., 768 F.2d 1001, 1026 (9th Cir.1985), cert. denied, 474 U.S. 1059, 106 S.Ct. 802, 88 L.Ed.2d 778 (1986). "Exceptional" cases include "bad faith or other opprobrious conduct." Id. at 1026 n. 2. We do not find this case is such an "exceptional" case.
 
 
 102
 We also decline to award attorney's fees on appeal.
 
 CONCLUSION
 
 103
 For the foregoing reasons, we affirm the finding of breach of contract by PI and remand for a new trial on damages. Because McClaran did not enter into a new agreement with R/T, the district court did not abuse its discretion in refusing to instruct the jury on PI's affirmative defenses.
 
 
 104
 The district court's finding that R/F is not liable for trademark infringement or for inducement to breach under an alter ego theory is affirmed. The entry of judgment against R/F for inducement to breach on a direct liability theory is reversed. McClaran is precluded from a new trial on R/F's alleged direct liability.
 
 
 105
 We reverse the district court with respect to the trademark infringement and inducement to breach claims against R/T and remand for further proceedings with respect to the trademark infringement claim.
 
 
 106
 AFFIRMED in part, REVERSED in part, and REMANDED.
 
 BOOCHEVER, Circuit Judge, dissenting:
 
 107
 Because I believe that we should remand for a new trial on the issue of R/F's direct liability, and because I believe Tennessee law does not require ill will or "actual malice" for inducement to breach a contract, I dissent in part.
 
 
 108
 * There is no doubt that R/F's direct liability was an issue at the outset of the case. The complaint clearly sets forth a claim for inducement to breach the contract against R/F, explicitly alleging:
 
 
 109
 Defendant Rotocast Plastic Products, Inc. [R/F] ... knew, or should have known of the contract which Plaintiff had with Defendant Plastic Industries, Inc. [PI].
 
 
 110
 Defendant Rotocast Plastic Products, Inc. [R/F] ... intentionally induced the breach of said contract.
 
 
 111
 The conduct of Defendant Rotocast Plastic Products, Inc. [R/F] ... was improper.
 
 
 112
 The inducement of Defendant Plastic Industries, Inc. to breach its contract with the plaintiff was the proximate result of acts of Defendant Rotocast Plastic Products, Inc. [R/F]....
 
 
 113
 The complaint, however, does not allege an alter ego claim against R/F. Nevertheless, the district court dismissed the alter ego claim against R/F at the close of McClaran's evidence. None of the court's statements thereafter explicitly indicates that the direct liability claim was dismissed as well. The court minutes of July 30, 1992, the ninth day of trial, state that the defendants' motion for directed verdict was "denied except as to Alter Ego Claims." There is no mention of direct liability. Thus, the claim that was before the court in the complaint was never explicitly dismissed. The record, even as quoted by the majority, is capable of the interpretation that the direct liability claim survived. Certainly McClaran thought so. As the majority acknowledges, he fought to include jury instructions on direct liability.
 
 
 114
 The majority fails to take into account any statements made after the dismissal of the alter ego claim. Yet surely those statements are relevant to the extent they show that at least McClaran believed the direct liability claim survived. At best, the record is ambiguous whether the court meant to dismiss all the claims against R/F, and statements after the dismissal make this ambiguity more acute.
 
 
 115
 Parklane Hosiery v. Shore, 439 U.S. 322, 327 n. 7, 99 S.Ct. 645, 649 n. 7, 58 L.Ed.2d 552 (1979), is quoted for the proposition that due process is violated if a judgment is used to bind "a litigant who was not a party or privy and therefore never had an opportunity to be heard." That proposition is unexceptional when applied in the collateral estoppel context (as in Parklane ): an earlier judgment may not be used against a litigant who was entirely uninvolved in the earlier case. In this case, however, R/F was a party, and perhaps a privy as well, that participated in the litigation-at least until the dismissal on one of the theories of liability.
 
 
 116
 It is not clear, however, whether R/F was led to believe it was dismissed entirely from the case. I therefore reluctantly conclude that the appropriate remedy is a remand for a new trial on the issue of R/F's direct liability, assuring R/F its full day in court. In Anthuis v. Colt Indus. Operating Corp., 789 F.2d 207 (3d Cir.1986), the Third Circuit reached a similar conclusion in an equally confusing situation in which
 
 
 117
 acting on a motion against an earlier defendant who ostensibly is no longer in the case, the district court entered summary judgment against two new defendants who were never named in the complaint and who never had an opportunity to respond to the allegations raised in the affidavits....
 
 
 118
 Id. at 211. While the Third Circuit held that "a defendant must be given notice and an opportunity to respond before a case is disposed of on the merits against that party ... even where the party in question is present in the case in some other capacity," id. at 211-12, it remanded for a new trial because the case was "complex," and "the pleadings and orders entered are, to say the least, confusing, and ... the legal theories on which the district court relied are not apparent." Id. at 213. In this case, as in Anthuis, I believe a new trial is necessary because "both the parties and this court should be fully informed as to the bases of the district court's decision." Id.
 
 II
 
 119
 I also respectfully disagree with the majority's conclusion that the Tennessee common-law claim of inducement to breach a contract requires actual malice, or "ill will, hatred, or spite." Both the Sixth Circuit and a federal district court, interpreting Tennessee law, have held that "malice" for the tort of inducement means legal malice, "the willful violation of a known right." Edwards v. Travelers Ins. of Hartford, 563 F.2d 105, 121 (6th Cir.1977); AmeriGas Propane, Inc. v. Crook, 844 F.Supp. 379, 389 (M.D.Tenn.1993) (quotations omitted). Such a violation can be shown by words and actions of the defendant demonstrating that he knew of the plaintiff's rights and yet acted in disregard of them. Id.; see also Continental Motel Brokers, Inc., v. Blankenship, 739 F.2d 226, 229-30 (6th Cir.1984). The Tennessee Court of Appeals recently reiterated its position that legal malice is all that is required in Riggs v. Royal Beauty Supply, Inc., 879 S.W.2d 848, 851 (Tenn.Ct.App.1994) ("malice, in this sense, is not factual malice, that is, hatred or spite or ill will. It's legal malice ... a wilful violation of a known right").
 
 
 120
 By contrast, none of the published cases cited by the majority expressly requires more. Testerman v. Tragesser, 789 S.W.2d 553 (Tenn.Ct.App.1989), the only Tennessee authority cited by the majority for the requirement of actual malice, merely states "malice or ill will must be established in order to recover for tortious interference with another's business " (emphasis added), a different tort. Id. at 556. Testerman then states that "malice" is a necessary element in inducement actions, without defining what malice means in those circumstances, and citing to TSC Indus. v. Tomlin, 743 S.W.2d 169, 173 (Tenn.Ct.App.1987), a case that does not define malice as ill will or spite. Testerman, 789 S.W.2d at 557. Such an oblique reference is not enough to create a real conflict with the clear weight of Tennessee authority. Ill will or spite may be required before a court may award punitive damages, see Hodges v. S.C. Toof & Co., 833 S.W.2d 896 (Tenn.1992), but the Hodges court does not discuss the tort of inducement to breach a contract.
 
 
 121
 In fact, requiring no more than a variety of legal malice for inducement is in accordance with the great weight of general authority on this issue. As the Restatement of Torts 2d explains at length, the malice element is equivalent to a requirement that the tortfeasor's conduct be unjustifiable or "improper." Restatement (Second) of Torts § 766, introductory note (1979). Such a requirement is not merely duplicative of a requirement that the conduct be intentional; it adds an inquiry "whether the actor was motivated, in whole or in part, by a desire to interfere with the other's contractual relations." Id. at § 767 cmt. d. While it may be easy to find such a motivation if the actor demonstrates ill will or spite, "[i]t has long been clear, however, that 'malice' in the sense of ill-will or spite is not required for liability." W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 129, at 983 (5th ed. 1984). See, e.g., G.K.A. Beverage Corp. v. Honickman, 55 F.3d 762, 767 (2d Cir.) (New York law requires knowledge and intent), cert. denied, --- U.S. ----, 116 S.Ct. 381, 133 L.Ed.2d 304 (1995); Thrift v. Hubbard, 44 F.3d 348, 356-57 (5th Cir.1995) (Texas law requires willfulness and intent, but not "malice"); Alvord-Polk, Inc. v. F. Schumacher & Co., 37 F.3d 996, 1015 (3d Cir.1994) (Pennsylvania law requires intentional and improper interference), cert. denied, --- U.S. ----, 115 S.Ct. 1691, 131 L.Ed.2d 556 (1995); Tata Consultancy Serv. v. Systems Int'l, Inc., 31 F.3d 416, 425 (6th Cir.1994) (Michigan law does not require hatred or ill will; economic motivation is enough); McNeill v. Security Ben. Life Ins. Co., 28 F.3d 891, 894 (8th Cir.1994) (Arkansas law requires purpose to interfere); Williams v. Shell Oil Co., 18 F.3d 396, 402 (7th Cir.1994) (Illinois law requires intentional and unjustified inducement); Summit Machine Tool Mfg. Corp. v. Victor CNC Systems, Inc., 7 F.3d 1434, 1442 (9th Cir.1993) (California law requires intentional, unjustified and wrongful breach); Brown Mackie College v. Graham, 981 F.2d 1149, 1152 (10th Cir.1992) (Kansas law requires intentional interference without legal justification).
 
 
 122
 There is no clear published authority that malice requires ill will, and ample authority--in and out of Tennessee--for not requiring ill will or spite. The district court was thus correct in denying R/T's motion for a directed verdict on this issue, and we should affirm the district court's finding of common-law inducement to breach. To do otherwise misinterprets Tennessee law and places the state outside the mainstream of inducement law.
 
 
 
 [1]
 McClaran signed the Licensing Agreement on February 15, 1985, even though the cover letter attached to the Licensing Agreement stated that McClaran had only until February 1, 1985, to respond to R/T's offer. See discussion infra part I.A.2
 
 
 [2]
 The parties agreed that this figure represents the jury's estimate of McClaran's "lost rotomolding profits" (profits McClaran would have made if he had entered the business of rotomolding Mustangs, which R/T's infringement deterred him from doing)
 
 
 [3]
 After finding R/F directly liable for inducement to breach, the court transferred the jury's damages award against R/T for inducement to breach to R/F
 
 
 [4]
 ASSIGNMENT/CONSENT. Although a contract may contain a provision which forbids assignment, it may be validly assigned by one of the parties if the other party consents to it. Once a party consents, he cannot later revoke his consent. If you find that McClaran consented to the assignment, then you must find in favor of Plastic Industries, Inc. on the breach of contract
 PI's requested Instruction No. 6.
 
 
 [5]
 REPUDIATION AND DISCHARGE. Defendant Plastic Industries, Inc. asserts that it was discharged of its obligations to McClaran because PI repudiated its contract and McClaran accepted Rotocast as the new party. A repudiation consists of the indication by words or conduct that a party is not going to render a performance of the contract. When a party to a contract repudiates its obligations, and offers performance by another person, and that other person partly performs the obligations, the other party's silent acceptance of the new person's performance operates as acceptance of the offer, and the original party is discharged
 If you find that McClaran discharged PI after repudiation of their contract, then you must find in favor of PI on the breach of contract claim.
 PI's requested Instruction No. 9.
 
 
 [6]
 We agree with the district court's finding that (1) PI was not obligated to sell a certain number of kayaks so long as PI was producing kayaks and (2) PI opened itself up to a claim for projected royalties when it breached the contract by turning the mold over to Rotocast
 
 
 [7]
 The jury's award of damages for breach was taken from McClaran's chart of projected sales
 
 
 [8]
 Appellants contend that McClaran should not have been allowed to testify as an expert. It is unclear, however, whether appellants are arguing that McClaran, a lay witness, was permitted to give opinion testimony, or whether the court erred in qualifying him as an expert. Determining whether a witness is an expert is ordinarily within the discretion of the trial court. United States v. Rahm, 993 F.2d 1405, 1409-10 (9th Cir.1993). The district court did not abuse its discretion in finding that McClaran's testimony about his research and experience in the kayak industry would assist the trier of fact. See Fed.R.Evid. 702. What was objectionable about his testimony was its speculative subject matter (e.g., how PI could have solved its production difficulties), not his expertise
 
 
 [9]
 Both PI and R/T contend that a new trial is required because the parol evidence rule bars this testimony. Although McClaran's testimony exceeded what was necessary to clarify the ambiguity in the integrated agreement, defense counsel did not object on the record. Admission of the evidence is therefore reviewed for plain error, a standard which PI cannot meet
 
 
 [10]
 The jury was instructed: "You have heard argument and testimony concerning whether Rotocast of Florida, the parent corporation, had complete dominion and control over its subsidiary, Rotocast of Tennessee, such that the parent should be liable for the acts of its subsidiary. I have now found as a matter of law that such complete control and dominion did not exist, and have dismissed Rotocast of Florida, the parent corporation, from this case." Instruction No. 9
 
 
 [11]
 Several statements by the court indicate that the court in fact dismissed R/F from the entire case. The court's oral order stated: "I'm going to dismiss the alter ego count. I think there's insufficient proof to hold them in." Tr. (Day 9) at 186 (emphasis added). At the close of trial, the court instructed the jury that it had dismissed R/F from the case. In addition, the jury's special verdict form contained no mention of R/F and none of the claims pertained to R/F. Finally, in its order entering judgment against R/F, the court reiterated that the court had previously dismissed "plaintiff's claim against Rotocast of Florida, a claim that had been based on an alter-ego theory." The only evidence to the contrary is the district court clerk's minutes, dated July 30, 1992 (ninth day of trial), which state that the defendants' motion for directed verdict was "denied except as to Alter Ego Claims."
 
 
 [12]
 McClaran's objections to the jury instructions could be construed as objections to the court's failure to instruct on direct liability. However, these objections do not demonstrate that R/F was still in the case; only arguments of direct liability before R/F's dismissal are relevant on that issue. Moreover, even these after-the-fact statements reveal that McClaran believed that R/F was completely dismissed. When McClaran's counsel objected to the jury instructions, he stated certain of his objections "relate to the dismissal of Rotocast Plastic Products from the case." Tr. (Day 10) at 125:20-21. It is further telling that the district court asked for R/T's, but not R/F's, objections to the jury instructions after McClaran had finished with its objections
 
 
 [13]
 Because of our reversal of judgment against R/F based on a due process violation, we do not consider whether R/F was also denied its Seventh Amendment right to a jury trial. R/F's substantive challenges to liability and damages are also moot
 
 
 [14]
 McClaran's claim of trademark infringement is based on R/T's use of his "M" logo on the Matador
 
 
 [15]
 McClaran argues that R/T waived this argument by not objecting to the jury instruction for inducement to breach. The jury was not instructed that malice was an element of inducement. Instead, the jury was instructed that R/T had to have "no legitimate business justification for its inducement to breach the contract." R/T did not object to this instruction. R/T has, therefore, waived any challenge to the instruction as given. Fed.R.Civ.P. 51. R/T may nevertheless challenge the denial of judgment as a matter of law on the grounds of insufficient evidence. In determining whether a trial court has erred in denying a motion for a directed verdict made at the close of the evidence, it is the applicable law which is controlling regardless of what the trial court announces the law to be in the jury instructions. Los Angeles Land Co. v. Brunswick, 6 F.3d 1422, 1426 n. 2 (9th Cir.1993), cert. denied, 510 U.S. 1197, 114 S.Ct. 1307, 127 L.Ed.2d 658 (1994)
 
 
 [16]
 Tenn.Code Ann. § 47-50-109 provides:
 It shall be unlawful for any person, by inducement, persuasion, misrepresentation, or other means, to induce or procure the breach of violation, refusal or failure to perform any lawful contract by any party thereto; and, in every case where a breach or violation of such contract is so procured, the person so procuring or inducing the same shall be liable for treble the amount of damages resulting from or incident to the breach of the contract; and the party injured by such breach may bring his suit for the breach and for such damages.
 
 
 [17]
 Statutory and common law inducement require proof that: (1) a legal contract existed; (2) the wrongdoer had sufficient knowledge of the contract; (3) the wrongdoer intended to induce its breach; (4) the wrongdoer acted maliciously; (5) the contract was breached; (6) the act complained of was the proximate cause of the breach; and (7) damages resulted from the breach. See TSC Indus. v. Tomlin, 743 S.W.2d 169, 173 (Tenn.Ct.App.1987)
 
 
 [18]
 The court denied a subsequent motion to dismiss the common law inducement claim, adding:
 Although I think [the motion to dismiss] should be granted. But there's a question the jury may believe the oral argument.... [If] they grant ... damages, then I'll consider a motion after that time to strike it. But I don't want to have to retry it if it goes up to the Circuit Court.
 Tr. (Day 9) at 186:4-11.
 
 
 [19]
 The district court had originally found no evidence of malice when it ruled on R/T's motion for summary judgment. The court was later persuaded that the requirement of malice required nothing more than intent to cause the breach and reinstated the common law cause of action. The court was persuaded that R/T's purchase of the mold in violation of PI's covenant to guard against theft of design constituted inducement to breach