255 F.3d 1136 (9th Cir. 2001)
 RON BIRD, INDIVIDUALLY AND ON BEHALF OF GLACIER CONSTRUCTION, INC.; HERB GILHAM, INDIVIDUALLY AND ON BEHALF OF GLACIER CONSTRUCTION, INC.; AND SCOTT SHERBURNE, INDIVIDUALLY AND ON BEHALF OF GLACIER CONSTRUCTION, INC., PLAINTIFFS-COUNTERDEFENDANTS-APPELLEES,
v.
GLACIER ELECTRIC COOPERATIVE, INC., DEFENDANT-COUNTERCLAIMANT-APPELLANT.
 No. 99-35162
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted July 18, 2000--Seattle, Washington
Filed July 10, 2001
 
 [Copyrighted Material Omitted]
 Jeremiah C. Lynch (argued), Great Falls, Montana, for the plaintiffs-counterdefendants-appellees.
 Paul R. Haffeman (argued), Tiffany B. Lonnevik, Davis, Hatley, Haffeman & Tighe, P.C., Great Falls, Montana, for the defendant-counterclaimant-appellant.
 Jonathan Hemenway Glazier, Arlington, Virginia, for amici National Rural Electric Cooperative Association and Montana Electric Cooperatives' Association.
 Michael E. Webster, Crowley, Haughey, Hanson, Toole & Dietrich P.L.L.P., Billings, Montana, for amici Farmers Insurance Exchange, Truck Insurance Exchange, and Fire Insurance Exchange.
 Charles E. McNeil, Garlington, Lohn & Robinson, Pllp, Missoula, Montana, for amicus Nationwide Mutual Fire Insurance Company.
 Appeal from the United States District Court for the District of Montana Paul G. Hatfield, District Judge, Presiding. D.C. No. CV-96-022-GF-PGH
 Before: Thomas M. Reavley[1]Diarmuid F. O'Scannlain, and Ronald M. Gould, Circuit Judges.
 
 Gould, Circuit Judge
 OPINION
 
 1
 Glacier Electric Cooperative, Inc. ("the Co-op") appeals the district court's judgment declaring that a judgment for compensatory and punitive damages rendered in the Blackfeet Tribal Court ("tribal court") is recognizable and enforceable in federal court. We must decide whether a district court may give comity to a tribal court judgment, for purposes of recognition and enforcement, where the closing argument of the successful plaintiff in tribal court included numerous statements encouraging ethnic and racial bias of an all tribal member jury against a corporate defendant that was owned and controlled by persons who were not tribal members. We conclude that the district court erred in giving comity to recognize and enforce the tribal court judgment here because, in view of the closing argument, the tribal court proceedings offended due process.[2] We have jurisdiction under 28 U.S.C. §§ 1291, and we reverse the judgment of the district court.
 
 FACTS & PROCEDURAL BACKGROUND
 
 2
 Appellees Ron Bird and Herb Gilham are enrolled members of the Blackfeet Tribe. In 1991, Bird and Gilham, along with Appellee Scott Sherburne, purchased Glacier Construction, Inc., a Montana corporation located in the town of Browning, on the Blackfeet Reservation.[3] Most of Glacier Construction's business then consisted of work for the Co-op: replacing power poles, installing electric service to houses, and performing other maintenance. The Co-op is a Montana corporation headquartered in Cut Bank, Montana, outside of the Blackfeet Reservation.
 
 
 3
 In the fifteen months after Bird, Gilham, and Sherburne's purchase of Glacier Construction, their relationship with the Co-op deteriorated. The Co-op gave Glacier Construction less construction and maintenance work, while increasing the work it gave to a non-Indian-owned construction company.[4] In June 1992, the Co-op informed Glacier Construction that it was canceling all agreements and contracts with Glacier Construction, and that Glacier Construction could expect no further work from the Co-op. The Co-op's purported reasons included concerns about the quality and expense of Glacier Construction's work, liability exposure from Glacier Construction's alleged use of unqualified employees, and the Co-op's financial condition.
 
 
 4
 Bird, Gilham, and Sherburne filed suit against the Co-op in the tribal court. They alleged that, before purchasing Glacier Construction, they had received assurances that the Co-op would "continue to do work with [Glacier Construction] to maintain its power grid." They contended that they purchased Glacier Construction in reliance on those assurances. Their complaint asserted claims for negligent misrepresentation, constructive fraud, and breach of contract (arising from alleged breach of assurances), defamation (based on allegations that the Co-op had published a false criticism of Glacier Construction's work performance), and violation of tribal employment preference ordinances enforced by the Blackfeet Tribal Employment Rights Office ("T.E.R.O.")[5] (based on the Co-op's alleged failure to comply with bidding and hiring requirements preferential to tribal members and the abandonment of Glacier Construction for a non-Indian-owned construction company).
 
 
 5
 The case was tried to a jury composed entirely of members of the Blackfeet Tribe. Glacier Construction's counsel argued during the trial that the Co-op ended its relationship with Glacier Construction not because of work quality, costs, and performance, but because the Co-op did not want to deal with an Indian-owned business and refused to give preference to tribal employment. The trial throughout had racial overtones that culminated a closing argument by Glacier Construction that repeatedly appealed to racial and ethnic prejudice. Glacier Construction's closing argument included mention of General Custer, analogies to "killing" and "massacre" of Indians, contrasts between "white man's magic" and the "lowly" Indians, references to the cavalry riding into town to kill an Indian business, and comment about the lands of the Indian people being taken by the "conquering people." The Co-op did not object to this argument, nor did it request any curative instruction or move for a new trial before the jury reached its decision.
 
 
 6
 The jury returned a verdict in favor of Glacier Construction on all claims, awarding $1,382,181.60 in compensatory damages and $775,000 in punitive damages.
 
 
 7
 The Co-op appealed to the Blackfeet Tribal Court of Appeals ("tribal court of appeals"). That court held that there is no private cause of action for damages under the T.E.R.O. and that the trial court had erred in allowing that portion of the case to proceed. However, the tribal court of appeals affirmed the judgment, including all damages, in other relevant respects.[6]
 
 
 8
 Bird, Gilham, and Sherburne, individually and on behalf of Glacier Construction, filed this action in the United States District Court for the District of Montana, asking the court to "recognize, enforce and register" the judgment of the tribal court, "so that execution may be issued thereon in the federal court system." The Co-op answered that the judgment should not be recognized because, among other things, the Co-op was not afforded due process in the tribal court proceedings.[7] Subsequently, the district court granted Appellees' motion for summary judgment, and this appeal followed.
 
 DISCUSSION
 I.
 
 9
 Because the decision to recognize a foreign judgment is discretionary, not mandatory, see Hilton v. Guyot, 159 U.S. 113, 163-64 (1895), some federal courts of appeals have concluded that a district court's decision to recognize a foreign judgment should be reviewed for abuse of discretion. See Finanz AG Zurich v. Banco Economico S.A., 192 F.3d 240, 246 (2d Cir. 1999); Remington Rand Corp. Delaware v. Business Sys. Inc., 830 F.2d 1260, 1266 (3d Cir. 1987). However, we review de novo claims of due process violations. See Hilao v. Estate of Marcos, 103 F.3d 767, 780 (9th Cir. 1996). If the tribal court violated due process, then the district court here had no discretion to recognize the tribal court judgment. See Wilson v. Marchington, 127 F.3d 805, 810 (9th Cir. 1997). Further, de novo review is required when reviewing a district court's summary judgment. See Botosan v. Paul McNally Realty, 216 F.3d 827, 830 (9th Cir. 2000). For these reasons, we review de novo whether the alleged due process violations precluded the district court's grant of comity here to the tribal court judgment.
 
 
 10
 The Co-op argues that it was denied due process in the tribal court and that the district court should not have given comity to recognize and enforce the tribal court judgment. This contention must be analyzed in light of principles of comity.
 
 
 11
 In Marchington, we held that principles of comity control whether a district court should recognize and enforce a tribal court judgment. Marchington, 127 F.3d at 807. We said that "as a general principle, federal courts should recognize and enforce tribal judgments." Id. at 810. Although we are bound by the Supreme Court's declarations of general principles of comity,[8] we said that "special considerations arising out of existing Indian law merit some modification in the application of comity to tribal judgments." Id. As pertinent here, we held comity is precluded and "federal courts must neither recognize nor enforce tribal judgments if . . . the defendant was not afforded due process of law." Id.[9]
 
 
 12
 In Marchington, we described due process for the purpose of comity analysis:
 
 
 13
 Due process, as that term is employed in comity, encompasses most of the Hilton factors, namely that there has been opportunity for a full and fair trial before an impartial tribunal that conducts the trial upon regular proceedings after proper service or voluntary appearance of the defendant, and that there is no showing of prejudice in the tribal court or in the system of governing laws. Further, as the Restatement (Third) [of Foreign Relations Law of the United States] noted, evidence "that the judiciary was dominated by the political branches of government or by an opposing litigant, or that a party was unable to obtain counsel, to secure documents or attendance of witnesses, or to have access to appeal or review, would support a conclusion that the legal system was one whose judgments are not entitled to recognition." Restatement (Third) §§ 482 cmt. b.
 
 
 14
 Id. at 811.
 
 
 15
 While principles of comity take into account differences in the judicial systems of foreign nations, the comity analysis appropriate for the "domestic dependent nation"[10] status of Indian nations is not well developed. In Marchington, we wrote that federal courts must respect the "special customs and practical limitations" of tribal courts:Comity does not require that a tribe utilize judicial procedures identical to those used in the United States Courts. Foreign-law notions are not per se disharmonious with due process by reason of their divergence from the common-law notions of procedure. Indeed, Hilton rejected challenges to a judgment based on lack of adequate cross-examination and unsworn testimony. Federal courts must also be careful to respect tribal jurisprudence along with the special customs and practical limitations of tribal court systems. Extending comity to tribal judgments is not an invitation for the federal courts to exercise unnecessary judicial paternalism in derogation of tribal self-governance.
 
 
 16
 Id. (internal quotation marks and citations omitted).[11]
 
 
 17
 Further, we have recognized that "development of tribal court systems is a critical component of tribal self-government, one which courts have encouraged." Montana v. Gilham, 133 F.3d 1133, 1140 (9th Cir. 1998). See also Stock West Corp. v. Taylor, 942 F.2d 655, 659 (9th Cir. 1991). As the Supreme Court has previously explained, "[t]ribal courts play a vital role in tribal self-government, and the Federal Government has consistently encouraged their development." Iowa Mut. Ins. Co. v. LaPlante, 480 U.S. 9, 14-15 (1987) (internal citation omitted). The importance of tribal courts and the dignity we accord their decisions will weigh in favor of comity in any case where we have discretion to recognize and enforce a tribal court judgment.
 
 
 18
 Nevertheless, our precedents make clear that a district court cannot properly give comity to a tribal court judgment if the tribal court proceedings violated due process. We must decide whether the tribal court procedures in this case violated due process so as to preclude comity.
 
 
 19
 Weighing an alleged due process violation in English courts, we have held that "unless a foreign country's judgments are the result of outrageous departures from our notions of 'civilized jurisprudence,' comity should not be refused. British Midland Airways Ltd. v. Int'l Travel, Inc., 497 F.2d 869, 871 (9th Cir. 1974) (quoting Hilton, 159 U.S. at 205). The procedure in question in British Midland Airways was "the forerunner of our summary judgment rule" and we concluded that the "English procedure comports with our standards of due process." Id. (internal quotation marks and citations omitted). Our holding in British Midland Airways makes clear both that we must assess due process given in a foreign nation and that a foreign court's procedures need not be identical to our procedures to permit a grant of comity.
 
 
 20
 Similarly, in Bank Melli Iran v. Pahlavi, 58 F.3d 1406 (9th Cir. 1995), we also analyzed the foreign tribunal for deviations from "basic principles of due process" and "civilized jurisprudence." Id. at 1413. The due process defects in the revolutionary Iranian courts were fundamental.
 
 
 21
 The evidence in this case indicated that [the defendant] could not expect fair treatment from the courts of Iran, could not personally appear before those courts, could not obtain proper legal representation in Iran, and could not even obtain local witnesses on her behalf. Those are not mere niceties of American jurisprudence. They are ingredients of "civilized jurisprudence." They are ingredients of basic due process.
 
 
 22
 Id. (citations omitted).
 
 
 23
 The Co-op argues that because the Blackfeet tribal and appellate courts follow procedures based on and parallel to procedures used in state and federal courts, a comity analysis should hold the tribal court to a due process standard similar to that commonly employed by the federal courts.
 
 
 24
 In Randall v. Yakima Nation Tribal Court, 841 F.2d 897 (9th Cir. 1988), petitioner, a member of the Yakima Indian Nation, sought habeas relief arguing that the tribal appellate court violated his due process rights under the Indian Civil Rights Act ("ICRA"), when his appeal was dismissed as a result of the tribal trial court failing to timely rule on his in forma pauperis motion. ICRA provides that "[n]o Indian tribe in exercising powers of self-government shall . . . deprive any person of liberty or property without due process of law . . . ." 25 U.S.C. §§ 1302(8).[12] We concluded:
 
 
 25
 In reviewing tribal court procedures to determine if they comport with this due process guarantee, "courts . . . [have] correctly sensed that Congress did not intend that the . . . due process principles of the Constitution disrupt settled tribal customs and traditions." F. Cohen, Handbook of Federal Indian Law 670 (1982 ed.) (footnote omitted); see Tom v. Sutton, 533 F.2d 1101, 1104 n. 5 (9th Cir.1976) ("courts have been careful to construe the term [ ] 'due process' . . . with due regard for the historical, governmental and cultural values of an Indian tribe"). Thus, defining the limits of due process protection under the Act "is not an easy process, because . . . [due process] concepts are not readily separated from their attendant cultural baggage; due process especially implies a number of particular procedural rights derived from Anglo-American history." F. Cohen, supra, at 670 (footnote omitted).
 
 
 26
 Id. at 900 (alterations in original). To conduct a due process review with deference to tribal customs and practices, we set this test:
 
 
 27
 Where the tribal court procedures under scrutiny differ significantly from those "commonly employed in Anglo-Saxon society," courts weigh "the individual right to fair treatment against the magnitude of the tribal interest [in employing those procedures]" to determine whether the procedures pass muster under the Act. Where the tribal court procedures parallel those found "in Anglo-Saxon society," however, courts need not engage in this complex weighing of interests. Where the rights are the same under either legal system, federal constitutional standards are employed in determining whether the challenged procedure violates the Act.
 
 
 28
 Id. (internal citations omitted) (emphasis added). Randall supports that in a comity analysis concerns for respecting a sovereign's procedures and avoiding paternalism are reduced when tribal court laws and procedures governing trials and appeals track those of our federal courts.
 
 
 29
 Here, the procedures in the Blackfeet tribal court system are similar to those of Anglo-Saxon law. The Blackfeet Tribal Law and Order Code of 1967 ("Blackfeet Code") by its express provisions establishes civil procedures for pretrial, trial, and appeal very similar to our federal court procedures.[13] Glacier Construction acknowledges in briefing that "the civil procedures of the Blackfeet Tribal Court at issue are patterned after the procedures of Anglo-Saxon society." Glacier Construction invokes the power of the federal courts by requesting that in comity the federal courts should recognize and enforce the tribal court judgment here arising from a tribal court system with express rules and procedures based on Anglo-Saxon law. It follows that our conception of due process for these tribal courts should be similar to that for federal and state courts. For purposes of our comity analysis in this case we see no reason to depart from traditional due process values requiring fundamental fairness.
 
 II.
 
 30
 We now address whether Glacier Construction's closing argument violated due process.[14]
 
 
 31
 To assess the Co-op's due process challenge to Glacier Construction's closing argument requires us to address two issues: (1) Does the Co-op's failure to object to Glacier Construction's closing argument or to move for a new trial on such grounds preclude our review of the closing argument's appeal to racial, ethnic, and national prejudice? (2) If our review is not precluded, did the appeal to prejudice violate due process, thereby barring comity for the recognition and enforcement of the tribal court judgment?
 
 
 32
 We have applied the plain error doctrine to civil trial court evidentiary rulings that were not objected to in a civil trial.[15] In Beachy v. Boise Cascade Corp., 191 F.3d 1010 (9th Cir. 1999), we applied the plain error standard to admission of hearsay evidence in a civil case "under which we consider[ed] whether the asserted error was highly prejudicial and affected Beachy's substantial rights." Id. at 1016. Similarly, in McClaran v. Plastic Industries, Inc., 97 F.3d 347 (9th Cir. 1996), we applied the plain error standard to an evidentiary ruling where counsel failed to object to the admission of improper testimony under the parol evidence rule. Id. at 357 n.9.
 
 
 33
 Our precedent does not clearly explain how plain error review is to be applied when reviewing closing arguments in civil cases. However, our decision in Kaiser Steel Corp. v. Frank Coluccio Construction, Co., 785 F.2d 656 (9th Cir. 1986), is instructive. There, the defendant challenged alleged inflammatory statements made by plaintiff's counsel during summation. We noted that the defendant failed to object until after judgment was entered, had not explained its failure to object, and failed to demonstrate that the challenged comments were as egregious as those successfully challenged in other cases. We explained: "Some of the remarks by [plaintiff's] attorney were immoderate. Others appear to be either de minimis infractions or comments susceptible of more than one meaning. In any event, we find nothing in the record that stands out as fundamental error." Id. at 658. Although we did not grant relief, Kaiser Steel suggests that relief would have been granted for "fundamental error," though it provides no definition of what constitutes fundamental error.
 
 
 34
 Further guidance is found in Kehr v. Smith Barney, Harris Upham & Co., Inc., 736 F.2d 1283 (9th Cir. 1984). There, on appeal the defendant challenged a district court decision denying its motion for a new trial following plaintiff's jury verdict. The appeal was based on alleged prejudicial acts and misconduct of plaintiff's counsel, including comments in opening statement and closing argument. The defendant argued that counsel's comments indulged in criminal imagery, commented on financial disparity between parties, dwelled on irrelevant subjects, and were otherwise improper. In declining to reverse for abuse of discretion, we noted, as one factor among others, that defendant's counsel "never objected during the closing argument or moved for a mistrial." Id. at 1286.
 
 
 35
 In Kehr, we did not treat a failure to object as a bar to review. Although we declined to grant relief, we assessed whether the improper remarks to the jury had caused sufficient prejudice to warrant a new trial. Id. We made clear that the attorney misconduct there did not so permeate the trial as to show that the jury was "necessarily prejudiced."[16] Id.; see also Cooper v. Firestone Tire & Rubber Co., 945 F.2d 1103, 1107-08 (9th Cir. 1991).
 
 
 36
 Because our precedent is inconclusive, we consider how other federal circuit courts have addressed assertions of error in closing argument or other civil case procedures absent an objection.
 
 
 37
 The D.C. Circuit has endorsed appellate review for "fundamental error" in civil cases where no objection was made. Shokuwan Shimabukuro v. Higeyoshi Nagayama, 140 F.2d 13, 15 (D.C. Cir. 1944). The court explained that "[t]here is no logical reason for refusing to exercise our power to notice fundamental error in cases where personal or property rights are involved, and our Rule 17(i), which states the principle, makes no distinction between civil and criminal actions." Id.
 
 
 38
 The First Circuit will review closing arguments for plain error in civil cases. In U.S.I. Properties Corp. v. M.D. Construction Co., Inc., 860 F.2d 1 (1st Cir. 1988), the court considered an appellant's request for reversal based on a closing argument challenging the veracity of appellant's witnesses and using words like "corrupt," "conspirators," "lies," and "prevarications." Appellant had not objected, but the First Circuit found it appropriate to "review the court's decision to allow the statements under the 'plain error' standard." Id. As explained in a subsequent decision, "[t]he overwhelming weight of authority supports the rule that, when no timely objection is made, claims of improper closing argument are forfeited, not waived, and thus amenable to review for plain error." Smith v. Kmart Corp., 177 F.3d 19, 25 (1st Cir. 1999). The First Circuit's test for plain error requires an exceptional case: "Under plain error review, we will consider a forfeited objection only if: (1) an error was committed; (2) the error was 'plain' (i.e. obvious and clear under current law); (3) the error was prejudicial (i.e. affected substantial rights); and (4) review is needed to prevent a miscarriage of justice." Id. at 26.
 
 
 39
 The Second Circuit has described "fundamental error" as "an error so serious and flagrant that it goes to the very integrity of the trial," and has made clear that, when there is no objection to trial procedures, an appeals court will review for fundamental error. Modave v. Long Island Jewish Medical Ctr., 501 F.2d 1065, 1072 (2d Cir. 1974).[17] In Greenway v. Buffalo Hilton Hotel, 143 F.3d 47, 51 (2d Cir. 1998), the court applied this principle in the context of reviewing a closing argument to which no objection had been made. Though denying relief on the facts, the court held that such argument was to be reviewed for "plain error" that went to the "integrity of the trial." Id.
 
 
 40
 The Third Circuit in Dunn v. HOVIC, 1 F.3d 1371, 1377 (3d Cir. 1993), has concluded that a defendant's failure to object to closing argument waives "its challenge to these statements on appeal." However, the court quoted an Eleventh Circuit case, Woods v. Burlington Northern Railroad, 768 F.2d 1287, 1292 (11th Cir. 1985) (per curiam), for the proposition that when a party fails to object to an improper closing argument in a civil case, an appellate court reviews for plain error. Dunn, 1 F.3d at 1377. See also McNello v. John B. Kelly, Inc., 283 F.2d 96, 102 (3d Cir. 1960).
 
 
 41
 The Fourth Circuit in Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989), considered the "fundamental error doctrine." It held: "Under this doctrine the court will consider issues raised for the first time on appeal 'if the error is "plain" and if our refusal to consider such would result in the denial of fundamental justice.' However, such error must be so serious and flagrant that it goes to the very integrity of the trial." Id. (quoting Stewart v. Hall, 770 F.2d 1267, 1271 (4th Cir. 1985)).
 
 
 42
 The Fifth Circuit has also recognized plain error, and has granted relief for plain error made in closing argument absent an objection. See Rojas v. Richardson, 703 F.2d 186, 190 (5th Cir. 1983). There, in an action by an employee against an employer for personal injuries, the court held that the reference in closing argument to plaintiff's status as an illegal alien, not supported by the record and irrelevant to the negligence claims, was prejudicial to plaintiff and constituted plain error. Id. In attempting to assess plain error, the court perceptively commented on the difficulties of defining plain error, concluding that plain error must be determined by the facts of each case:
 
 
 43
 The plain error rule is not a run-of-the-mill remedy. It is invoked only in exceptional circumstances to avoid a miscarriage of justice. The exact delineation of plain error is difficult to articulate. We have defined plain error as error which is both obvious and substantial. But such elegant phraseology yields little guidance. The determination still rests ultimately on the facts of each case.
 
 
 44
 Id. (internal quotation marks and citations omitted). See also Edwards v. Sears, Roebuck & Co., 512 F.2d 276, 286 (5th Cir. 1975) (absent objection, the court granted relief holding that "the error in final argument was of such magnitude . . . as to have seriously prejudiced defendants' right to a fair trial . . . ."). In Edwards, the court explained:
 
 
 45
 Rules of practice and procedure are devised to promote the ends of justice, not to defeat them. A rigid and undeviating judicially declared practice under which courts of review would invariably and under all circumstances decline to consider all questions which had not previously been specifically urged would be out of harmony with this policy. Orderly rules of procedure do not require sacrifice of the rules of fundamental justice.
 
 
 46
 Id.
 
 
 47
 The Eighth Circuit permits plain error review of closing argument. See Thomure v. Truck Ins. Exch., 781 F.2d 141, 143 (8th Cir. 1986); see also Whitehead v. Food Max of Miss. Inc., 163 F.3d 265, 278 (8th Cir. 1998) (granting relief for improper closing argument, in part based on plain error); Pavlik v. Cargill, Inc., 9 F.3d 710, 715 (8th Cir. 1993). In Thomure, the court held that "[w]hen statements in a closing argument are not objected to at trial, we may only review them on a plain error standard. We may reverse only in extraordinary situations, if the error is so prejudicial as to cause a miscarriage of justice." 781 F.2d A 143 (internal citation omitted).
 
 
 48
 The Eleventh Circuit in Oxford Furniture Cos., Inc. v. Drexel Heritage Furnishings, Inc., 984 F.2d 1118 (11th Cir. 1993), explained its plain error rule:
 
 
 49
 Our general rule is that a timely objection is necessary to bring to the district court's attention errors in counsel's arguments. When no objections are raised, we review the arguments for plain error, but a finding of plain error is seldom justified in reviewing argument of counsel in a civil case. Nevertheless, when the interests of substantial justice are at stake, we may order a new trial.
 
 
 50
 Id. at 1128 (internal quotation marks and citations omitted).
 
 
 51
 Against all the above circuits that recognize plain or fundamental error in civil cases, the Seventh Circuit stands alone for contrary authority, providing an apparently strict bar to appellate review of an alleged error in argument absent objection. See Deppe v. Tripp, 863 F.2d 1356 (7th Cir. 1988). That case involved a suit by investors against promoters alleging securities fraud, RICO violations and other claims. Plaintiffs lost at trial. On appeal, the Seventh Circuit rejected a challenge to defendants' closing argument absent contemporaneous objection, holding that failure to object or move for a mistrial in a civil case waives any right to challenge an improper closing argument. Id. at 1364-65. The court distinguished civil cases involving economic and property interests from criminal cases where liberty interests were involved, reasoning: "In civil cases where economic and property interests are usually at stake, as opposed to criminal cases where more substantial liberty interests are involved, a plain error doctrine is unneeded." Id. at 1364. This analysis was met with a strong dissent, which criticized the majority for proceeding on the incorrect assumption that the civil docket concerned economic and property issues, even though in the dissent's view "much of that [civil] docket involves important issues of individual liberty." Id. at 1368 (Ripple, J., dissenting from the denial of rehearing en banc). We agree that liberty interests may be at stake in civil cases. But, perhaps more importantly, the due process clause explicitly protects not only liberty, but also property rights.
 
 
 52
 There is some merit to the concern that a party should not normally await the outcome of a trial before complaining, and there also are cases where a curative instruction would alleviate risks of prejudice from unfair argument.[18] But these are only factors to be considered in the balance of assessing whether due process was denied; they cannot reasonably justify a complete bar on appellate review of plain or fundamental error, no matter how unfair and no matter how prejudicial.
 
 
 53
 The overwhelming weight of authority from other circuits supports reviewing for plain error or fundamental error when an error is alleged for the first time on an appeal in a civil case. Doubtless, contemporaneous objections at trial are to be encouraged. Where objections are made, there may be an opportunity for the trial judge to foreclose further error or to provide a curative instruction. For such reasons, courts permitting review of plain error in civil cases generally do so only in extraordinary cases.
 
 
 54
 In Kaiser Steel, we implicitly suggested that relief would have been given for "fundamental error." 785 F.2d at 658. We now clarify our rule: We will review for plain or fundamental error, absent a contemporaneous objection or motion for a new trial before a jury has rendered its verdict, where the integrity or fundamental fairness of the proceedings in the trial court is called into serious question.
 
 
 55
 Accordingly, here we will consider whether Glacier Construction's closing argument to the jury in tribal court offended fundamental fairness and deprived the Co-op of our Constitution's guarantee of due process.[19]
 
 III.
 
 56
 Glacier Construction in closing argued in inflammatory terms not only that the Co-op had wrongly treated plaintiff Glacier Construction's Indian-owned business, but also that there had been a legacy of injustice to Indians, broken treaties, and colonialism at the reservation:
 
 
 57
 About eight blocks from here there's a business . . . . That business has been killed, and that's what this lawsuit is all about.
 
 
 58
 Ordinarily, when you kill a human being there's laws like murder, rape, robbery, burglary that you can bring somebody that's responsible for wrongly taking another person's life.
 
 
 59
 In this case the leaders of the Blackfeet Nation have done something to protect Indian businesses when they are killed, and they've passed laws called the T.E.R.O. ordinance . . . .
 
 
 60
 T.E.R.O. was kind of started by the Blackfeet . . . and these laws we know exist on approximately 18 reservations, and you'll get to go through these, but just let me read what the wisdom of your tribal leaders are. This is what's [sic] they say, "And that's why as land, water, and minerals, jobs and private employment on or near the reservation are an important resource for Indian people, and Indians must use their legal rights to obtain their rightful share of them as they become available, and Indians have unique and special employment rights . . . ."
 
 
 61
 [T]he history of the reservation has been a history of oppression and where jobs are taken away, and your tribal leaders have said on this reservation to make up for the injustice of the years, the broken treaties, the colonialism that's occurred to the reservation, being pushed up back and back and to make up for that there's a preference. That's what equity is. Indians are in first place, the last becoming the first, and that's what this T.E.R.O. is all about
 
 
 62
 Glacier Construction's counsel contended that after Bird, Gilham, and Sherburne purchased Glacier Construction, it began to receive less work from the Co-op, while a nonIndian-owned company received more. Glacier Construction's counsel referred to the "Custer massacre," and to the "cavalry" acting so that "the uprising is being put down," to describe how the Co-op had terminated and destroyed an Indian business:
 
 
 63
 So as a kind of self-defense they go to Donny White [the T.E.R.O. director] and say Donny, this is not fair. That the T.E.R.O. laws are being violated. This Indian business is being choked out, and Donny White knows Mr. Chapman [manager of the Co-op]. He says Mr. Chapman, I think we need to meet because after all, there's T.E.R.O. laws here. We're trying to protect our own business from being killed, and what I think happens reminds me kind of a mixture of slavery and the Custer massacre.
 
 
 64
 Mr. Chapman calls in his senior staff, all white people . . . . I think it's really interesting that the cavalry has a little meeting of the war chiefs, and they are going to come out, and he looks on this as an opportunity to tell Donny White that the uprising is being put down, and these T.E.R.O. Indians better not get too uppity and his words were it's an opportunity to tell them it's over. No warning. . . . [O]n July 11th they ride into town, and they kill, they kill these men's dream, their ambitions, their business, and did they do this fairly, did they do this honestly, did they do it rightly? I don't think so.
 
 
 65
 After disputing the Co-op's managers' motives, Glacier Construction's counsel continued in closing argument to link the Co-op's behavior to white racism in exploitation of Indians:
 
 
 66
 This lawsuit is really about T.E.R.O., but the issue of racism has been brought up. When I hear racism -I was raised in Great Falls, and I used to walk to Saint Mary's grade school a mile each day . . . . I went right by the Charlie Russell Museum, and one thing that came to my mind is that Hill 57 . . . . [T]hat's the poor Indian hill in town, there's an Indian lady walking the other way with a weathered face and little dirty dress and looks beaten down and is what strikes me right away being the disparity, and yet this was a land that once belonged to the Indian people with the buffalo and the grass and all of that, and overnight we white people, my ancestors, if we go back far enough, yours too, conquered, and the wealth had to be taken by the conquering people, and it's taken a little bit of time for us to come to grips with the fact that there's an institutional bias in the off reservation society. It's inherited.
 
 
 67
 Further, counsel urged Glacier Construction's theory about the Co-op's purported biased attitude toward Indians:
 
 
 68
 All this money, such an efficient organization. How can they trust any of their work to the likes of unskilled Indian contractors like these? Certainly the white man's magic is so much better . . . . I think you have seen a classic defense to castrating the T.E.R.O. laws on the reservation. The first thing you do is say our business is so big and sophisticated that you lowly Indians, you really can't cut the mustard.
 
 
 69
 Counsel then proceeded to describe the termination of the contract between the parties as a murder:
 
 
 70
 They did a lot of work, and they did a lot of good work, and all of sudden on June 11th they were massacred. They were killed, and when I think of murder I think of the first recorded murder in human history and kind of went like this.
 
 
 71
 Counsel, after mentioning the biblical story of Cain slaying Abel, returned to explicitly racial themes, arguing that "a lot of jobs have been killed" and "that the blood of this murdered business is crying from the ground. It's crying out to you, and it's saying don't let them kill Indian businesses."
 
 
 72
 The Co-op did not contemporaneously object to any of this argument. Nor did it move for a new trial.
 
 
 73
 The Co-op's relationship with Glacier Construction was relevant to its claims. Glacier Construction's theory of the case was that the Co-op did not want to do business with an Indian-owned company, and therefore discriminated against it and intentionally breached contractual assurances and defamed the Indian owners of Glacier Construction. Despite the possible relevance of the Co-op's motive and intent, the racially inflammatory comments made during closing argument went well beyond the limits of legitimate advocacy. Glacier Construction's closing argument did not simply discuss the facts and legal theories applicable to this case, but rather attacked the Co-op and its management as part of the white race that historically oppressed the Indians. Glacier Construction's closing argument was replete with appeals to bias, including references to Custer, slavery, the cavalry riding into town to kill, "white man's magic," the wealth of the Indian people being taken by the "conquering people," and assertions "that there's an institutional bias in the off reservation society," and "functional prejudice [against Indians] that's built in." These statements were an emotionally-charged appeal to Indian collective memory, encouraging the jury to consider historical racial oppression allegedly perpetrated by the white race against Indians.
 
 
 74
 Apart from these broad racial statements, which were not specific to the Co-op or related to the Co-op's particular conduct in this case, the assertions of bias of particular Co-op managers were designed to raise prejudice and inflame the jury. Glacier Construction's counsel presented the jury with an imagined thought-process of the racist white Co-op management, wherein these managers willfully decided to "kill" Glacier Construction's business, staffed as it was by "uppity," "lowly," and "unskilled" Indians -thoughts and words that counsel attributed to and put in the mouths of the Co-op's managers. Despite this rhetoric, there is no evidence in the record that the Co-op's managers ever used such disparaging terms to describe the owners or employees of Glacier Construction. More generally, and even viewed in the light most favorable to Glacier Construction, the tribal court record and testimony are wholly inadequate to support the racist attitudes imputed to the Co-op's managers in closing argument.
 
 
 75
 We recently decided in United States v. Cabrera, 222 F.3d 590 (9th Cir. 2000), to reverse a verdict in a drug prosecution because of a government witness's repeated testimonial references to an asserted prominence of "Cubans" in drug trafficking. Applying the plain error standard, we concluded that "[a]ppeals to racial, ethnic, or religious prejudice during the course of a trial violate a defendant's Fifth Amendment right to a fair trial." Id. at 594.
 
 
 76
 In Bains v. Cambra, 204 F.3d 964 (9th Cir. 2000), we similarly condemned as error a prosecutor's closing argument suggesting that "Sikhs" had a tendency to violence and retribution. Id. at 974-75. However, we affirmed the district court based on our assessment of the evidence because we concluded this error was "harmless error." Id. at 977-78.
 
 
 77
 Glacier Construction argues that plain error review of such an appeal to prejudice is more crucial in criminal cases than in civil cases, attempting to distinguish these precedents. But fairness to parties and the need for a fair trial are important not only in criminal but also in civil proceedings, both of which require due process. Racial stereotyping cannot be condoned in civil cases. Further, the types of inappropriate testimony and argument considered in the criminal cases above are mild if compared to the closing argument in this case.
 
 
 78
 Argumentative appeals to historical racial prejudices of or against the white race have no proper place in a civil trial, especially one in which the tribal court is exercising jurisdiction over a non-member before an exclusively tribal jury. The basis for liability of the Co-op, if such existed, in law had to be conduct of the Co-op. It is fundamental to our system of justice that persons are to be held responsible for their own conduct and not for the conduct of their ancestors. If those managing the Co-op in fact discriminated against Glacier Construction because of an anti-Indian bias, this might have provided support for legal liability on one of Glacier Construction's claims.
 
 
 79
 The conduct of Custer had no relevance to this case, and the reference to "the Custer massacre" in closing argument therefore could only have been urged in an attempt to incite prejudice and inflame the jury. The repeated analogies to "killing," the cavalry riding into town to kill, and the other prejudicial statements all had no proper purpose in this trial.
 
 
 80
 But the closing argument unmistakably had the improper effect of encouraging the all-Blackfeet tribal jury to impose an impassioned sanction against the managers of the Co-op because of their race. We conclude that the Co-op was necessarily prejudiced when, in closing argument, counsel used incendiary racial and nationalistic terms to encourage the all-Blackfeet jury's award against the non-Indian Co-op.
 
 
 81
 This argument was irrelevant and unfair to the Co-op because it focused on the Co-op managers' race rather than their deeds. It was also unfair, in another sense, to Glacier Construction, for it was deprived of the possibility of a jury verdict and vindication based on a fair proceeding. There were two versions of the case presented in evidence to the jury. Glacier Construction's version urged the Co-op's inadequate preference to tribal employment, conduct biased against Indians, and breach of its duties. The Co-op's version urged it terminated the relationship because the Co-op had financial problems and wanted to use only one contractor, and because of deficiencies in performance by Glacier Construction, including inexperienced personnel, high costs, and management problems.
 
 
 82
 We are not triers of fact. That role was assigned to the tribal court jury. But the jury's verdict was to have been rendered in a fair proceeding. In view of the closing argument, the tribal court proceeding was not fair. There is no reasoned way now to assess the competing facts presented at trial by the parties. We cannot say that the jury likely would have found the Co-op liable absent the inflammatory appeal to racial bias. Further, even if the jury might have found the Co-op liable absent the appeal to racial prejudice, we cannot now assess the amount the jury might have awarded for compensatory or for punitive damages, absent improper argument.
 
 
 83
 We hold that Glacier Construction's appeal to racial prejudice in closing argument in its civil case in tribal court offended fundamental fairness and violated due process owed the Co-op.
 
 IV.
 
 84
 As explained above, the district court did not have discretion to give comity to the tribal court judgment in favor of Glacier Construction if the tribal court proceedings deprived the Co-op of due process. Having concluded that the closing argument of Glacier Construction offended due process by its appeal to racial enmity and bias, we reverse the decision of the district court to recognize and enforce the tribal court judgment under principles of comity. The tribal court judgment may not be recognized and enforced because to do so would again violate the due process rights of the Co-op.
 
 
 85
 Further, based on the record before us, the law requires that the district court enter summary judgment for the Co-op denying comity to the tribal court judgment. We have previously recognized that a court has power sua sponte to grant summary judgment to a non-movant when there has been a summary judgment motion by one party and no cross-motion. Cool Fuel, Inc. v. Connett, 685 F.2d 309, 311 (9th Cir. 1982). Here, there exists no genuine issue of material fact pertaining to the due process violation in closing argument, and the Co-op is therefore entitled to judgment as a matter of law.[20]
 
 
 86
 We reverse the judgment of the district court and remand with instructions that the district court enter judgment for the Co-op, declining to recognize and enforce the tribal court judgment.[21]
 
 
 87
 REVERSED and REMANDED to the district court WITH INSTRUCTIONS to enter judgment for the Co-op denying comity.
 
 
 
 Notes:
 
 
 [1]
 The Honorable Thomas M. Reavley, Senior Circuit Judge for the Fifth Circuit, sitting by designation.
 
 
 [2]
 The Co-op challenges other aspects of the tribal court proceedings, in addition to the closing argument, in contending that the proceedings violated due process. The other contentions of due process violations include: (1) an alleged restriction of Blackfeet jury service to members of the Blackfeet Tribe; (2) an alleged conflict of interest of the tribal court judge arising out of his financial relationship with the Co-op; (3) an alleged lack of formal legal training of the tribal court trial and appellate judges; (4) challenged ex parte contacts among the jurors, witnesses, parties, and counsel; (5) the decision of the tribal court judge to allow the jury to go on a site visit to the Co-op's on and off-reservation facilities; (6) the admission at trial of allegedly irrelevant, incompetent, and unfairly prejudicial opinion testimony from several lay witnesses of the Co-op who asserted that the Co-op had bias against Indians; (7) alleged defective service of process on the Co-op; (8) alleged conflict of interest arising from multiple roles assumed by an attorney in the Blackfeet tribal court system; and (9) alleged systemic deficiencies in the Blackfeet tribal court system. Because we conclude that the closing argument violated due process, precluding comity for the tribal court judgment, we need not and do not address these other issues.
 Because we have only the suit by Glacier Construction and its principals to recognize and enforce the tribal court judgment, we do not address the merits of Glacier Construction's claim, nor do we address whether there may be further proceedings in the tribal court.
 
 
 [3]
 For ease of reference we refer to Appellees collectively as "Glacier Construction."
 
 
 [4]
 In this opinion, we refer to "Indians" to mean "Native Americans" because the terms "Indian" and "Indians" are generally used throughout the testimony, arguments, and proceedings in the tribal court system, the United States District Court, and the briefing.
 
 
 [5]
 In the record, the parties and the tribal court consistently refer to this claim as the "T.E.R.O." claim. For ease of reference, we follow their convention.
 
 
 [6]
 The tribal court of appeals did not require any further hearing regarding whether the compensatory and punitive damages awards should have been reduced or vacated in view of its reversal of the T.E.R.O. claim.
 
 
 [7]
 The Co-op also took the position that the judgment should not be recognized because the tribal court lacked personal jurisdiction over it, and because of an "absence of reciprocity between the tribal court and the federal courts." It has abandoned these positions on appeal. The Co-op also moved in district court for summary judgment based on lack of personal jurisdiction, but has abandoned that position on appeal.
 
 
 [8]
 In Hilton, the Supreme Court recognized:
 [W]here there has been opportunity for a full and fair trial abroad before a court of competent jurisdiction, conducting the trial upon regular proceedings, after due citation or voluntary appearance of the defendant, and under a system of jurisprudence likely to secure an impartial administration of justice between the citizens of its own country and those of other countries, and there is nothing to show either prejudice in the court, or in the system of laws under which it was sitting, or fraud in procuring the judgment, or any other special reason why the comity of this nation should not allow it full effect, the merits of the case should not, in an action brought in this country upon the judgment, be tried afresh, as on a new trial or an appeal, upon the mere assertion of the party that the judgment was erroneous in law or in fact. 159 U.S. at 202-03.
 
 
 [9]
 The sole ground asserted by the Co-op in support of denying comity is that the tribal court proceedings violated due process. We have no need to consider in this case whether equitable considerations short of a denial of due process would preclude a federal court from giving comity to the tribal court judgment. See Marchington, 127 F.3d at 810.
 
 
 [10]
 The Supreme Court has long described Indian nations as "domestic dependent nations." This phrase was introduced by Chief Justice Marshall in Cherokee Nation v. Georgia, 30 U.S. (5 Pet.) 1, 17 (1831).
 
 
 [11]
 Although Marchington describes a due process analysis appropriate for tribal courts, that case was decided on jurisdictional, not due process, grounds.
 
 
 [12]
 We look to ICRA by analogy, for the only federal remedy provided is through habeas review of the legality of detention by an Indian tribe's order. See 25 U.S.C. §§ 1303; Santa Clara Pueblo v. Martinez, 436 U.S. 49, 69-72 (1978). ICRA's protections are available to non-Indians subject to jurisdiction of tribal governments. See Oliphant v. Suquamish Indian Tribe, 435 U.S. 191, 196 n.6.
 
 
 [13]
 One commentator has said that tribal codes such as the Blackfeet Code are "unquestionably Anglo-American documents." Brakel, Samuel J., American Indian Tribal Courts The Costs of Separate Justice 17 (1978).
 
 
 [14]
 In district court, the Co-op asserted generally that tribal court proceedings and evidentiary rulings offended due process, and its due process challenge to closing argument can be viewed as subsumed in its broader allegation. The Co-op's opening brief on appeal to us did challenge due process in the tribal court proceeding, consistent with the arguments urged in the district court, but the Co-op only raised specifically the challenge to Glacier Construction's closing argument in its reply brief. We will not ordinarily consider an issue in the reply not argued in the opening brief. United States v. Garcia, 149 F.3d 1008, 1010 (9th Cir. 1998). However, we have discretion to consider issues not raised by a party when the issue is one concerning jurisdiction, federalism, or comity that the court could raise sua sponte. See Swan v. Peterson, 6 F.3d 1373, 1383 (9th Cir. 1993). In addition, both parties had an opportunity to discuss the issues concerning closing argument in supplemental briefing. These considerations, and the importance of the issue for fundamental fairness, lead us to consider whether Glacier Construction's closing argument violated due process.
 
 
 [15]
 Federal Rule of Evidence 103(d) provides that "[n]othing in this rule [requiring an objection] precludes taking notice of plain errors affecting substantial rights although they were not brought to the attention of the court." However, apart from this rule of evidence, there is no express civil rule of procedure governing the application of "plain error."
 In contrast, Federal Rule of Criminal Procedure 52(b) specifically calls for plain error review in criminal case and establishes the scope of plain error review. For an appellate court to correct an error not raised at trial pursuant to Rule 52(b), "there must be (1) error, (2) that is plain, and (3) that affects substantial rights. If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." Johnson v. United States, 520 U.S. 461, 466-67 (1997) (internal quotation marks and citations omitted).
 
 
 [16]
 Kehr's discussion relies in part on Standard Oil Co. v. Perkins, 347 F.2d 379, 388 (9th Cir. 1965), in which we declined to give relief for attorney misconduct where the misconduct did not "sufficiently permeate an entire proceeding to provide a conviction that the jury was influenced by passion and prejudice in reaching its verdict." For conduct to "permeate" a proceeding it need not occur throughout the proceeding. Were that the case, the most blatant, unjustified, and prejudicial misconduct in closing argument would never warrant reversal because it would have occurred only at the end of a trial.
 
 
 [17]
 In reaching this conclusion, the Second Circuit cited U.S. v. Atkinson, 297 U.S. 157, 160 (1936), which recognized that under exceptional circumstances an appellate court should review errors to which no objection has been made if the errors were obvious or otherwise seriously affected fairness, integrity, or public reputation of judicial proceedings.
 
 
 [18]
 As a justification for its holding, the majority in Deppe reasoned: "We have not hesitated in the past to bind a party to its strategic decision to sit silent in the face of claimed error by refusing relief when the party complains because the result is unfavorable." Id. at 1363 (internal quotation marks and citation omitted). The court further considered:
 If a party fears that an objection during closing argument will incur the jury's wrath, he still must preserve his objections to any allegedly prejudicial comments. For example, a nearly contemporaneous objection made at the bench at the close of an opponent's argument, clearly stating the grounds for the objection, would preserve the matter for appellate review. Such a procedure would also afford the trial court an opportunity to attempt to cure the claimed error through use of a jury instruction.
 Id. at 1363 n.10 (internal quotation marks and citation omitted).
 
 
 [19]
 Because the Co-op limits its challenge to comity to a claim that the tribal court proceedings denied them due process, we need not decide whether a challenge to the integrity of the proceedings that does not assume the proportions of a due process violation may nonetheless be considered fundamental and cognizable on plain error review.
 
 
 [20]
 Because we conclude that due process precludes comity for the tribal court judgment in total, we need not decide whether we can enforce a tribal court's judgment for punitive damages. Compare Her Majesty the Queen v. Gilbertson, 597 F.2d 1161, 1163 (9th Cir. 1979) (citing Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 413-14 (1964)) (we do not grant comity to foreign judgments when the judgment is based on foreign tax or penal laws), with Huntington v. Attrill, 146 U.S. 657, 666-68 (1892) (discussing rule that courts should refuse to enforce foreign penal and tax judgments, suggesting in dicta that rule has no application in civil case where a penal-like award goes to private litigant rather than to foreign government, and further stating that comity may be appropriate in qui tam actions that award treble damages because "the act indeed does give a penalty, but it is to the party grieved"). Cf. Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 275 (1989) ("punitive damages advance the interests of punishment and deterrence, which are also among the interests advanced by the criminal law"); BMW of North America, Inc. v. Gore, 517 U.S. 559, 568 (1996) (punitive damages "further a State's legitimate interests in punishing unlawful conduct and deterring its repetition"). Further, we need not review whether the Supreme Court's recent decision in Cooper Industries, Inc. v. Leatherman Tool Group, Inc., 121 S. Ct. 1678 (2001), has implications for review of comity decisions regarding a tribal court judgment awarding punitive damages.
 
 
 [21]
 Had this case been tried in federal court, our ruling might permit consideration of the possibility of a remand for a new trial. But because the case was tried in tribal court, we hold only that the tribal court judgment is not entitled to comity and may not be recognized or enforced in federal court.